754 P.2d 863 (1988)
In the Matter of N.L., an Alleged Deprived Child.
Jenny Kay CARNEY, nee Riley, Appellant,
v.
Patrick E. MOORE, Assistant District Attorney and Tom Moore, Attorney for N.L., Appellees.
No. 66651.
Supreme Court of Oklahoma.
April 19, 1988.
Judy Lewis, Oklahoma Indian Legal Services, Oklahoma City, for appellant.
Thomas E. Moore, Okmulgee, for appellee, State of Okl.
Patrick E. Moore, Asst. Dist. Atty., Okmulgee County, Okmulgee, for appellant, N.L., an alleged deprived child.
*865 SUMMERS, Justice.
This is a juvenile case in which N.L. was adjudicated to be "deprived" and made a ward of the court. He was born out of wedlock on February 27, 1984. Since he is eligible for membership in both the Kaw and Creek Indian tribes through his mother provisions of the state and federal Indian Child Welfare Acts[1] are implicated. The father is not a party in these proceedings.
A chronology of the events in the trial court reveals the following. An order was issued on May 2, 1984, which granted temporary custody of N.L. to his maternal grandmother. A petition was filed on May 8, 1984, which alleged that N.L. was a deprived child as defined in 10 O.S. 1981 § 1101. The petition alleged that N.L. was neglected due to his mother's "pattern of leaving the said child in the care of various neighbors for indefinite periods of time."
The trial court adjudicated N.L. to be a deprived child, ordered an investigation by the Department of Human Services, and continued the temporary custody of N.L. with his maternal grandmother, all on June 25, 1984. The child's mother did not appear and the return on her summons indicated that she had "left the county with her present whereabouts unknown". The Creek Nation filed an answer declining to intervene and the Kaw Tribe did not appear, although the Kaw Tribe was served with notice of the proceeding.
A dispositional order was rendered on August 9, 1984, which placed temporary custody of N.L. with his maternal grandparents. The mother did not appear. A redispositional hearing was held on June 17, 1985. The mother appeared with counsel at this hearing and was granted three months to meet certain conditions or her *866 parental rights would be subject to termination. Prior to this dispositional hearing N.L.'s grandmother had suffered an incapacitating injury and she had placed N.L. with the Huddlestons on her own. Custody of N.L. was then ordered to the Huddlestons, neighbors of the maternal grandparents.
On February 12, 1986, the trial court set aside the June 25, 1984, adjudication order, for the reason that the mother did not receive sufficient notice of the adjudicatory hearing of June 25, 1984. On February 14, 1986, the trial court granted temporary custody of N.L. to the Huddlestons. On February 14, 1986, an amended petition was filed alleging that N.L. was a deprived child for the identical reason set forth in the original petition.
The mother filed a petition on May 7, 1986, to transfer the proceeding to the Court of Indian Offenses.
On May 7, 1986, the court denied the petition to transfer the proceeding, adjudicated that N.L. was a "deprived" child and made N.L. a ward of the court. A dispositional order was pronounced on May 28, 1986, which granted temporary custody of N.L. to the Huddlestons and imposed conditions upon the mother. The mother appealed the orders of May 7 and May 28.

I. PRE-ADJUDICATION ORDERS
The mother asserts on appeal that the actions of the trial court require reversal of the adjudication order finding her child to be deprived. She contends that the failure of the state to file an affidavit in conformity with 10 O.S.Supp. 1982 § 40.5, the absence of a hearing as provided by 10 O.S. 1981 § 1104.1, and the failure of the proceedings to conform to 25 U.S.C. § 1922, are errors of such a magnitude as to require reversal of the proceedings. We cannot review the mother's contention that the trial court failed to follow these three statutes.
No motion or argument appears in the trial court record questioning the statutory sufficiency of the amended petition. Similarly, no motion or argument was addressed to the trial court attacking the temporary custody orders for lack of a hearing pursuant to 10 O.S.Supp. 1984 § 1104.1. No reference to 25 U.S.C. § 1922 appears in the trial court record before us.
A party may not assign errors on appeal which were not presented to the trial court. Arkansas Louisiana Gas Co. v. Cable, 585 P.2d 1113, 1116 (Okl. 1978); Kepler v. Strain, 579 P.2d 191, 193 (Okl. 1978).
The misapplication of 10 O.S. Supp. 1984 § 1104.1, 10 O.S.Supp. 1982 § 40.5, 25 U.S.C. § 1922 does not defeat the jurisdiction of the trial court.[2]
Misapplication of the statutes in this case does not present a question involving the welfare of the people at large sufficient for de novo appellate review.[3]
The mother's allegations of error that the trial court failed to follow 25 U.S.C. § 1922, 10 O.S.Supp. 1982 § 40.5, and 10 O.S.Supp. 1984 § 1104.1, do not come within exceptions to the general rule that allegations of error must be presented to the trial court. Therefore, they are beyond the scope of our review on appeal.

II. EXPERT WITNESSES
The mother asserts that the adjudication of her child as deprived was without a required expert witness. No pre-adjudicatory custody order shall remain in force *867 and effect for more than thirty (30) days[4] "without a determination by the court, supported by clear and convincing evidence and the testimony of at least one qualified expert witness, that custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 10 O.S.Supp. 1982 § 40.5.
A court is required to consider the testimony of a qualified expert witness before placement of an Indian child in foster care.
25 U.S.C. § 1912(e) states:
"No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."
A court is also required to consider testimony of a qualified expert witness before termination of parental rights of the parent or Indian custodian. 25 U.S.C. § 1912(f) states:
"No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."
The required expert testimony is to provide the court with knowledge of the social and cultural aspects of Indian life to diminish the risk of any cultural bias. State ex rel. Juvenile Department v. Tucker, 76 Or. App. 673, 710 P.2d 793, 799 (1985). The guidelines for state courts promulgated by the United States Bureau of Indian Affairs, while not binding on the court, assist in defining a qualified expert witness. 44 Federal Register 67584 (1979).
"D.4 Qualified Expert Witnesses
(a) Removal of an Indian child from his or her family must be based on competent testimony from one or more experts qualified to speak specifically to the issue of whether continued custody by the parents or Indian custodians is likely to result in serious physical or emotional damage to the child.
(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings.
(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
(iii) A professional person having substantial education and experience in the area of his or her specialty.
(c) The court or any party may request the assistance of the Indian child's tribe or the Bureau of Indian Affairs agency serving the Indian child's tribe in locating persons qualified to serve as expert witnesses." 44 Federal Register at 67593.
The guidelines provide that a professional person with substantial education and experience in the area of his or her specialty may be a qualified expert witness. Special knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias.
"[W]hen cultural bias is clearly not implicated, the necessary proof may be provided by expert witnesses who do not possess special knowledge of Indian life. Here, the issue before the court was whether the continued custody of the child by mother would result in serious emotional harm to the child because of *868 mother's mental illness. There was no dispute about that condition or as severity. Termination or not had nothing to do with mother's fitness to care for the child according to the cultural dictates of her tribe. State ex rel. Juvenile Department v. Tucker, 710 P.2d at 799.
Social workers may be qualified expert witnesses if they have substantial education and experience in their specialties. D.W.H. v. Cabinet for Human Resources, 706 S.W.2d 840, 843 (Ky.App. 1986); Matter of J.L.H., 316 N.W.2d 650, 651 (S.D. 1982). However, for social workers to be qualified expert witnesses they must possess "expertise beyond the normal social worker qualifications." State ex rel. Juvenile Department v. Charles, 70 Or. App. 10, 688 P.2d 1354, 1359 N. 3 (1984), (quoting, House Report for the Indian Child Welfare Act, H.R. 1386, 95 Cong., 2d Sess. 22, Reprinted in 1978 U.S.Code Cong. and Admin. News 7530, 7545).
The social worker that testified in this case had some knowledge of the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq., and limited experience with Indian children. The purpose of the qualified expert witness provision is to provide the court with evidence of tribal customs as they relate to family practices in raising children. The determination of the best interests of the child must include consideration of tribal family practices unless cultural bias is clearly not implicated. State ex rel. Juvenile Department v. Tucker, supra.
An objection to a witness testifying as an expert must be raised in the trial court or this court will not consider the issue on appeal. Sorge v. Graham, 312 P.2d 929, 932 (Okl. 1957). However, the mother's petition in error and brief on appeal contend that the evidence was insufficient due to a lack of testimony by a qualified expert witness. The State's complaint against the mother consisted primarily of an allegation that the mother did not display a sense of responsibility or significant degree of interest in the child and such action of the parent constituted an abandonment of the child by the mother.
In People in Interest of S.R., 323 N.W.2d 885 (S.D. 1982), the court determined whether the burden of proof had been satisfied to terminate parental rights where the mother was unfit by "showing no sense of responsibility or significant degree of interest in the child." Id. 323 N.W.2d at 888. In S.R., the trial court qualified two witnesses "as experts within the purview of the ICWA" and they testified that returning custody of the child to the mother would result in serious emotional and physical damage to the child. Id. In D.E.D. v. State, 704 P.2d 774 (Alaska 1985), the testimony of expert witnesses indicated that serious emotional or physical damage would occur if the child were returned to his mother after the mother had abandoned the child. Id. 704 P.2d at 783.
Testimony showing that continued custody of the child by the parent is likely to result in serious emotional or physical harm to the child is necessary. 25 U.S.C. § 1912(c) and (f); 10 O.S.Supp. 1982 § 40.5. Testimony from a qualified expert witness indicating that such harm will result from continued custody of the parent is sufficient. People in Interest of S.R., supra. Where cultural bias is clearly not implicated, expert witnesses who do not possess special knowledge of Indian life may provide the necessary proof that continued custody of the child by the parent will result in serious emotional or physical harm to the child. State ex rel. Juvenile Department v. Tucker, supra.
We find that the evidence presented in the trial court does not contain any expert witness testimony as to whether the continued custody of the child by the mother would result in serious emotional or physical harm to the child.
The adjudication of the child as deprived must be reversed with instructions to the court to consider, in light of testimony of an expert witness qualified as required herein, whether continued custody of the child by the mother would result in serious emotional or physical harm to the child.

III. DENIAL OF MOTION TO TRANSFER
The mother asserts that her motion to transfer the proceeding to her tribal *869 court was improperly denied. The mother sought to transfer the proceedings from Okmulgee County to the tribal court in Kay County. All of the witnesses and the child resided in Okmulgee County. The mother resided in Oklahoma County. A proceeding involving the custody of an Indian child, not domiciled on his tribe's reservation, shall be transferred to the tribal court "in the absence of good cause to the contrary." 25 U.S.C. § 1911(b).
Good cause to deny a transfer has been found where almost all of the parties and witnesses reside in the county of the state court and have no contact with the tribal court. Matter of Adoption of Baby Boy L., 231 Kan. 199, 643 P.2d 168, 178 (1982); In re Interest of Bird Head, 213 Neb. 741, 331 N.W.2d 785, 790 (1980).
The best interests of the child may prevent transfer of jurisdiction to a tribal court. Matter of M.E.M., 195 Mont. 329, 635 P.2d 1313, 1317 (1981). In denying the petition to transfer, the trial court stated that the child had good care under the supervision of the court, the child had "established roots here in Okmulgee County," and that the court was working toward the goal of "getting this mother back with the child."
The presence of witnesses and parties in Okmulgee County, and the best interests of the child support a finding of good cause to deny the requested transfer.

IV. DENIAL OF CONTINUANCE
The mother requested a continuance of the dispositional hearing held on May 28, 1986.[5] The stated reason for the continuance was "an opportunity to controvert the recommendations and findings that are contained in this report [by the Department of Human Services]." The report was prepared on May 16, 1986, and then supplemented on May 22, 1986, and May 28, 1986.[6]
A fair opportunity must be given to a parent to controvert a report. Matter of Paul, 555 P.2d 603, 605 (Okl. 1976). The supplemental material indicated the efforts by the Department of Human Services in ascertaining the correct address for the mother.[7] The mother presented a witness and testified herself on the issue of the correct address and the history of her changes in residence.[8] The mother's witness and testimony demonstrate that she had a fair opportunity to controvert the supplemental reports.
A request for a continuance is within the sound discretion of the trial court, and a trial court's decision to deny a continuance will not be disturbed on appeal unless abuse of discretion is clearly shown. Wetsel v. Independent School District I-1, 670 P.2d 986 (Okl. 1983). The trial court did not abuse its discretion where the mother presented testimony to controvert the supplemental reports.
The child welfare worker testified at the dispositional hearing that copies of the report were given to "all of the attorneys involved in the suit."[9] The mother did not explain the nature of the evidence she expected to obtain and its materiality to the proceeding. 12 O.S. 1981 § 668. The mother did not file a written motion and affidavit for continuance, nor attempt to show due diligence in obtaining evidence to controvert the report. Id. The mother made no argument explaining why a continuance would be required to give the mother a "fair opportunity" to controvert the report. The record is silent as to the opportunity actually afforded the mother to controvert the report. Legal error may not be presumed by the reviewing court from a silent record. Johnson v. Johnson, 674 P.2d 539 (Okl. 1983). The trial court's denial of a continuance of the dispositional hearing is affirmed.

V. PLACEMENT PLAN
The mother contends that a placement plan was not filed in accordance with *870 10 O.S.Supp. 1983 § 1115.1. This contention was not raised in the trial court. A placement plan was filed on July 2, 1984, but none was filed after the filing of the amended petition. This allegation of error was not presented to the trial court and is beyond the scope of our review. Kepler v. Strain, supra.

VI. CUSTODY OF THE CHILD
The mother contends that the placement of her child in foster care with the Huddlestons was not consistent with the Indian Child Welfare Act. The mother requested that the trial court place the child in accordance with that Act.[10] The Act specifies that foster care or preadoptive placement should be with: (1) a member of the child's extended family; (2) a foster home licensed, approved, or specified by the child's tribe; (3) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (4) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs. 25 U.S.C. § 1915. The Indian child's tribe may establish a different order of preference by resolution. 25 U.S.C. § 1915(c). The child welfare worker testified that the Huddleston's home was not an approved foster home.[11] No evidence was introduced as to whether the child's tribe had approved, licensed, or specified a foster home. Section 1915 requires placement of the child in the categories specified "in the absence of good cause to the contrary." 25 U.S.C. § 1915(b).
The Department of Human Services child welfare worker testified that no Indian foster homes were available.[12] The Creek tribe had been contacted about foster homes, but apparently the Kaw tribe had not been contacted.[13] Mrs. Huddleston testified that she was one-eighth Cherokee and was in the process of providing verification of her Indian status.[14] She also testified that Mr. Huddleston's grandfather was a full-blood Cherokee, and that he was in the process of providing verification of his Indian status.[15]
A finding of "good cause to the contrary" is predicated upon the court's consideration of the placement categories specified. Where no inquiry occurs as to whether the child's tribe has licensed, approved, or specified a foster home, the court has not adequately considered such a placement.
We remand the case for a new dispositional hearing because the record does not disclose that the trial court afforded placement preference to the categories specified in 25 U.S.C. § 1915.
On remand the court should consider whether the "good cause" exception in § 1915 is met by the child's best interests. In re Interest of Bird Head, 213 Neb. 741, 331 N.W.2d 785, 791 (1983).
The adjudication order determining N.L. to be deprived is reversed with instructions. The dispositional order of May 28, 1986 is reversed with instructions. The trial court's orders denying a transfer and denial of a continuance are affirmed.
HARGRAVE, V.C.J., and HODGES, LAVENDER and ALMA WILSON, JJ., concur.
DOOLIN, C.J., and OPALA and KAUGER, JJ., concur in part, dissent in part.
SIMMS, J., dissents: I would affirm the trial court.
OPALA, Justice, with whom DOOLIN, Chief Justice, and KAUGER, Justice, join, concurring in part and dissenting in part.
Today the court reverses the trial court's orders declaring N.L. to stand in a deprived child's status and determining his custodial *871 placement. Its decision is grounded on error [1] in not meeting the Indian Child Welfare Act's [ICWA or Act][1] requirement for expert testimony in support of deprived-status declaration and [2] in not following the Act's preferences for the child's placement. The court affirms the trial court's rulings that deny the mother's requests to [1] transfer the proceedings to the tribal court and [2] continue the dispositional hearing. The court dismisses other arguments advanced by the mother because she did not raise them as error in the trial court. These are: (a) the trial court failed to follow certain required statutory procedures at the preadjudicative stage of the deprived-status proceedings and (b) no statutorily mandated placement plan was on file below.
I concur in today's reversal of the adjudicative and dispositional orders and in the court's holding that the trial court correctly refused to transfer jurisdiction of the deprived-status proceedings to the tribal court.
I would go further and also reverse the preadjudicative decision which directed N.L.'s emergency removal because the court's order, rendered in 1986, lacked the fundamental ingredient of notice adequate to inform the mother of that offending conduct which the State relied on for the child's removal; I would reverse the deprived-status adjudication because is stands unsupported by expert testimony mandated by the ICWA; I would set aside the dispositional order because, once the deprived-status adjudication is vacated, that order no longer has any legal foundation upon which it may be rested; finally, I would remand the cause with directions that the trial court (a) forthwith issue a preadjudicative order with the affidavit attached as required by law and (b) then conduct a hearing on the issue of the child's preadjudicative placement.

I THE ANATOMY OF LITIGATION
Born to Jenny Kay Careny on February 27, 1984, N.L. was eligible through his mother for membership in both the Kaw and Creek Indian Tribes. On May 2, 1984 his temporary custody was placed in his maternal grandmother. A petition filed shortly thereafter alleged that N.L. was a deprived child. On June 25, 1984 N.L. was adjudged to stand in that status. His temporary custody remained in the maternal grandmother. The mother was not present at the hearing. Her whereabouts were then unknown. The Creek and Kaw Tribes were notified of the hearing but did not intervene in the proceeding.[2] On June 17, 1985 N.L.'s temporary custody was changed from his maternal grandmother to a nontribal family, the Huddlestons. The mother appeared at this hearing.
On February 12, 1986 the district court set aside its June 25, 1984 adjudication for lack of sufficient notice to the mother. Two days later, the court granted an emergency order which continued N.L.'s custody in the Huddlestons. On May 9, 1986 the court denied the mother's petition to transfer the case to the Court of Indian Offenses. On the same day it declared once again that N.L. was a deprived child and allowed the Huddlestons to retain his temporary custody.

II THE REVIEWABILITY OF THE MOTHER'S JURISDICTIONAL CHALLENGE JURISDICTIONAL CHALLENGE TO THE TRIAL COURT'S ASSUMPTION OF COGNIZANCE OVER THE CHILD'S PREADJUDICATIVE CUSTODY
The mother asserts the trial court's failure to follow certain statutory process during the preadjudicative stages is violative of her due process rights. She directs us to two instances in which the trial court disregarded the minimum standard of mandated procedure: [1] a show cause hearing required by § 1104.1(C) of the Juvenile *872 Code[3] was not held within 48 hours either of the 1984 or the 1986 order, both of which authorized N.L.'s emergency removal and [2] contrary to § 40.5(A) of the state ICWA, no statutorily mandated affidavit was attached to either of these orders.[4]
The record reveals the mother's brief to the trial court  in support of her oral motion to dismiss the 1984 proceedings  clearly challenged the trial court's failure to afford her a § 1104.1(C) hearing following the child's emergency removal. This challenge had a jurisdictional dimension. It questioned the court's power to decide the preadjudicative placement issue. The infirmity asserted in the mother's motion was not subsequently cured by the 1986 preadjudicative process. The latter was equally fatal.[5]

A

The statutory requirements and their, due process implications
The terms of § 40.5(A) of the state ICWA provide that when a court authorizes the emergency removal of an Indian child from its parent or Indian custodian in accordance with § 1922 of the federal ICWA, the order shall be accompanied by an affidavit containing information about the parents' offending conduct that has resulted in the child's removal.[6]
The Juvenile Code, § 1104.1(C), provides in part that whenever a child is taken into custody as a deprived child, its parents or guardians are entitled to a show-cause hearing within 48 hours to determine why the child had been taken into custody or why it should not be returned to its parent.[7]
These statutory requirements have a constitutional dimension. The § 40.5.(A) affidavit is an indispensable component of due process because it is to impart notice of the parent's alleged offending conduct the State relies upon as its basis for the child's removal. The trial court's failure to conduct a § 1104.1(C) hearing denied the mother an opportunity to refute the petition's allegations and hence to prevent the child's removal.
Cognizance to decide custody placement in a preadjudicative phase of a deprived-status proceeding cannot be validly exercised unless it was acquired and assumed in strict conformity to the minimum standards of due process.[8] Due process inexorably commands notice which reasonably informs a person that his legally protected interest may be adversely affected.[9] parents are unable to oppose an emergency *873 removal of children unless the nature of the complaint against them is known. The information to be contained in the affidavit  which must include a "specific and detailed account of the circumstances" leading to removal of the child  is the first notice parents will ordinarily receive of the grounds for the impending juvenile proceeding. The affidavit's importance is made clear when, as in the present case, the emergency orders and their extensions are obtained in ex parte proceedings.

B

The preadjudicative and merits stages of the deprived-status proceedings are jurisdictionally separable and distinct
A due process infirmity rising to a jurisdictional dimension may be presented for the first the when the nisi prius decision is challenged for its constitutional flaw on direct appeal.[10] An emergency order, within the meaning of § 1104.1(C), is tantamount to process by which the court acquires jurisdiction over the preadjudicative (pendente lite) custody of the child.
The preadjudicative custody state is to be viewed as jurisdictionally separable from the merits of the deprived-status proceedings. These stages draw on separate sources for the court's assertion of its cognizance. The former stage calls for the exercise of judicial power over the child and the latter extends over the parents' status. The merits stage focuses on the parents' rights while the preadjudicative phase centers on the child's present condition.[11]
The trial court's preadjudicative stage jurisdiction was tainted by a fatally flawed process because the 40.5(A) notice-giving affidavit was not attached to the 1986 emergency order. The mother was afforded neither the requisite notice nor an opportunity to challenge this preadjudicative custody determination. The 1986 infirmity in acquiring jurisdiction over the child's preadjudicative custody was cured neither by waiver nor by the mother's later appearances in the case to defend her embattled parental interest. The latter proceeding was jurisdictionally separate and distinct from the former.

C

The scope of the court's review
The mother's jurisdictional challenge goes to the very heart of the court's power over the child's status rather than to the correctness of an in-trial ruling and that power is subject to invalidation because of failure to give adequate notice at the critical preliminary state of the proceeding. She brings a direct attack for want of a jurisdictional element  the power of the court to act. She argues that he procedure by which the power over her child first came to be asserted was fatally flawed. When jurisdiction over a judicial proceeding is acquired by a facially defective process, want of an objection interposed in the trial court is not a barrier to appellate review in the absence of a waiver. This is particularly so when the court gives no opportunity to challenge the tainted process by a hearing.[12]
*874 We can presume neither the presence of jurisdictional prerequisites not their waiver from a silent record.[13] The record here does not reflect that an affidavit was attached either to the 1984 or the 1986 emergency order. Neither is there any record trial of a show-cause hearing afforded the mother within 48 hours of these emergency orders. In short, the record is absolutely devoid of a showing that at the preadjudicative custody state jurisdiction was acquired by means that are constitutionally mandated. The child was taken away from the mother without the benefit of either the notice-giving affidavit or a hearing. Because the mother was not haled into court for a show-cause hearing, she had no duty to object to the defective process.
There are two distinct jurisdictional prerequisites for the preadjudicative and merits stages of a deprived-status proceeding. The mother's right to due process was violated here in the initial assumption of jurisdiction over the preadjudicative state. The only fit cure of this fatal defect is to vacate the preadjudicative decision and to require an immediate post-remand hearing that will address the placement issue pending adjudication of the merits.[14]

III BURDEN OF PROOF FOR ADJUDICATION OF AN INDIAN CHILD'S DEPRIVED STATUS
The mother contends that the State did not demonstrate by clear and convincing evidence that her conduct was likely to cause serious emotional or physical harm to N.L. This is so, she asserts, because the trial court did not rely on evidence from "qualified expert witnesses' within the meaning of § 1912. In short, her position is that the evidence at trial was not sufficient to affect her parental status.
Section 1912(e) of the ICWA provides that no foster care placement may be ordered unless there is
"... clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent of Indian custodian is likely to result in serious emotional or physical damages to the child."[15] [Emphasis added.]
The BIA guidelines provide that under the ICWA an expert witness should have knowledge of tribal customs concerning family organization and child rearing practices. The expert may be a member of the tribe, one who has substantial experience in rendering family services to Indians, or a professional who has considerable education in his specialty.[16] The guidelines *875 specify that poverty, alcohol abuse, or nonconforming social behavior is not evidence that the child should be removed from his Indian home. Rather, the state must demonstrate that a cause-and-effect relationship exists between the poverty or conduct and the potential for serious harm to the child.[17]
State courts have generally found that the term "qualified expert witness" in the context of the ICWA requires that the witness have experience with Indian culture and family organization. While this requisite exceeds typical social worker qualifications,[18] the failure of experts to possess knowledge of Indian social practices is not necessarily fatal to the state's case.[19] Some courts have held that social workers qualify as expert witnesses because they come within the BIA term "professional persons having substantial education and experience in the area of his or her specialty."[20] Other courts have found that testimony from a typical social worker can be properly admitted, but that it should be supplemented by an expert witness who has expertise in Indian family affairs.[21]
In this case, the district court heard testimony from the child welfare worker assigned to investigate N.L.'s status. She had some knowledge of the ICWA and limited experience with Indian children. Her testimony was relevant but it did not comport with the Act's intent. One of the basic goals of the ICWA is to prevent state courts from making custody determinations involving Indian children without meaningful input about tribal family practices.[22] The ICWA does not stray from the fundamental principle that the child's best interests are paramount. The act recognizes that the best interests concept must incorporate, for a legally effective custody decision, consideration of the child's Indian background.[23]
I would hence reverse the deprived-status adjudication because no expert testimony was available as required by the ICWA. On remand, the district court should direct the State to produce testimony from persons with expertise in Indian family matters.

IV PLACEMENT PREFERENCE
Section 1915(b) requires that in a foster care or preadoptive placement determination the child should be placed, in the absence of good cause to the contrary, with:
"(i) a member of the Indian child's extended family;

*876 (ii) a foster home licensed, approved or specified by the child's tribe;
(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."[24]
The statutory norm was originally followed in this case when N.L. was placed with his maternal grandmother. The district court did not make an explicit finding as to why the court did not continue to follow statutory placement preferences when it changed custody from the maternal grandmother to the Huddlestons.
Because the trial court's dispositional decision is fatally infirm, on remand it should determine if there was sufficient reason to reach for placement purposes outside the statute's preferences. The court should consider that the "good cause' exception in § 1915, as with the issue of transfer to a tribal court (see Part V infra), was designed to allow state courts flexibility in rendering an Indian child custody decision.[25] If the child's best interests are served by a placement outside of the statutory preferences, then that placement should be upheld.

V TRANSFER OF CUSTODY DETERMINATION TO TRIBAL COURT WAS NOT WARRANTED IN THE PRESENT CASE
The mother asserts that various provisions of the state and federal ICWA, as well as the juvenile Code, were violated during the proceedings below. She contends that the State failed to establish good cause for refusing to transfer this proceeding to her tribal court. Section 1911(b) of the ICWA provides that if an action involves an Indian child not domiciled on his tribe's reservation then the case shall be transferred to the tribe's jurisdiction "in the absence of good cause to the contrary."[26]
The question of transfer hinges upon the resolution of two issues; (1) the definition of "good cause to the contrary" and (2) which party must prove good cause exists. Good cause is not defined within the ICWA itself, but the Act's language appears to indicate that the burden of proof rests with the party opposing the transfer.
The legislative history of the ICWA indicates that the good cause exception to tribal court jurisdiction was designed to allow a state court to apply a "modified doctrine of forum non conveniens.[27] Generally in forum non conveniens cases, a court considers whether it has easy access to the sources of evidence, whether witnesses are available, the expenses of brining witnesses to trial and any other problems related to the expediency and expense of the trial.[28] As modified for the Indian child custody context, forum non conveniens requires that state courts determine whether the tribal court is a less convenient forum. This determination must also consider the rights of the Indian parents, the Indian child and the tribe.[29]
The Bureau of Indian Affairs [BIA] has established guidelines that address the good case issues.[30] Though they are not *877 binding,[31] these guidelines indicate what the BIA believes to be necessary to the proper application of the Act. The guidelines require that a state court conduct an adversary hearing before deciding whether to transfer the action to a tribal court prior to determining the merits of the case.[32] The burden of establishing good cause is cast in the State.[33] The guidelines define good cause by listing several factors that the state court should examine when determining whether good cause exists.[34] One of these factors is whether the evidence necessary to the case can be adequately presented in the tribal court without under hardship to the parties or witnesses.
State courts have uniformly applied forum non conveniens when deciding whether good cause to deny a transfer exists.[35] If virtually all of the witnesses and parties involved reside in the county of the state court had have no contact with the tribal court, then transfer may be denied for good cause.[36] In addition to the BIA guidelines, a state court may deny transfer it the state has by clear and convincing evidence shown that the best interests of the child would be injured by the transfer.[37] State courts also follow the BIA guidelines with respect to the requirement that the state bear the burden of establishing that there is good cause not to *878 transfer the proceeding.[38]
On the question of transfer in this case, the district court heard testimony from the Kaw Tribe representative, the Department of Human Service caseworker and witnesses relevant to the custody determination. The witnesses necessary to decide the custody issue are all located in Okmulgee County  the neighbors who cared for N.L. during the mother's absences and the families who have had, and continue to have, temporary custody of N.L. The Department of Human Services in Okmulgee County has investigated N.L.'s status throughout these custody proceedings. The mother is the only individual involved in this action who lives outside of Okmulgee County.[39] It is thus clear that under the doctrine of forum non conveniens, as incorporated in the BIA guidelines, there is ample reasons to deny transfer to the tribal court because the entirety of the evidence relevant to the custody issue is located in the county of the state court.[40]
I would reverse (1) the preadjudicative custody determination, (2) the deprived-status adjudication and (3) the dispositional decision; I would remand the cause with directions (a) to forthwith issue a preadjudicative order with the attached affidavit required by law and (b) to conduct a hearing to determine, under application of proper procedure, the child's preadjudicative custody placement and for further proceedings not inconsistent with the views I express in this opinion.
NOTES
[1] The Oklahoma Act is found at 10 O.S.Supp. 1982 § 40 et seq.; the U.S. Act at 25 U.S.C. § 1901 et seq.
[2] The trial court's jurisdiction includes the jurisdiction over the parties, jurisdiction over the subject matter, and jurisdictional power to pronounce the particular judgment rendered. Mayhue v. Mayhue, 706 P.2d 890, 893 N. 8 (Okl. 1985). Jurisdiction over the subject matter occurs upon the filing of the petition. 10 O.S. 1981 § 1102. The mother appeared with counsel in the proceedings. The trial court has jurisdictional power to specify the appropriate conduct for a parent. 10 O.S.Supp. 1982 § 1116.
[3] Where a question for review is of such a nature that the welfare of the people at large is involved, the Court in its discretion may consider the question though not presented to the trial court. First National Bank of Alex v. Southland Production Co., 189 Okl. 9, 112 P.2d 1087 (1941).
[4] The court may extend the effective period of the order an additional period of sixty (60) days. 10 O.S.Supp. 1984 § 40.5(B).
[5] Tr. at 25.
[6] Tr. at 2.
[7] Tr. at 67.
[8] Tr. at 33-34, 36-37.
[9] Tr. at 2.
[10] Tr. at 47.
[11] Tr. at 8, 13.
[12] Tr. at 4, 12.
[13] Tr. at 11-12.
[14] Tr. at 27.
[15] Id.
[1] 25 U.S.C. § 1912(e).
[2] The Federal Indian Child Welfare Act (P.L. 95-608) is codified in 25 U.S.C.A. § 1901 et seq. The state counterpart, known as the Oklahoma Indian Child Welfare Act, is found in 10 O.S.Supp. 1982 § 40 et seq. The provisions pertaining to notice are found in § 1912 of the federal act and in § 40.4 of the state enactment.
[3] The term of 10 O.S.Supp. 1984 § 1104.1(C) provide:

"Whenever a child is taken into custody as a deprived child, the parents or guardian of the child are entitled to a hearing within forty-eight (48) hours of the child being taken into custody, and thereafter at such intervals as may be determined by the court, in order to show cause why such child has been taken into custody or why custody should not be remanded to the parents.' [Emphasis added.]
[4] See footnote 6 infra for the full text of 10 O.S.Supp. 1982 § 40.5(A).
[5] See discussion in part II(C) infra.
[6] The terms of 10 O.S.Supp. 1982 § 40.5(A) are:

"A. When a court order authorizes the emergency removal of an Indian child from the parent or Indian custodian of such child in accordance with 25 U.S.C. Section 1922, the order shall be accompanied by an affidavit containing the following information:
1. The names, tribal affiliations, and addresses of the Indian child, the parents of the Indian child and Indian custodians, if any,
2. A specific and detailed account of the circumstances that lead the agency responsible for the removal of the child to take that action; and
3. A statement of the specific actions that have been taken to assist the parents or Indian custodians so that the child may safely be returned to their custody." [Emphasis added.]
[7] See footnote 3 supra for the full text of 10 O.S.Supp. 1984 § 1104.1(C).
[8] York v. Halley, infra note 11 at 364; Pettit v. American Nat. Bank of Austin, infra note 10 at 529 and Carnely v. Cochran, infra note 13, 369 U.S. at 515, 82 S.Ct. at 890.
[9] The term of Art. 2 § 7, Okl. Const, provide: "No person shall be deprived of life, liberty, or property, without due process of law." Matter of C.G., Okl., 637 P.2d 66, 68 [1981]; Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313-315, 70 S.Ct. 652, 657, 94 L.Ed. 865, 872-874 [1949] and Bomford v. Socony Mobil Oil Co., Okl., 440 P.2d 713, 719 [1968].
[10] See Johnson v. Zerbst, 304 U.S. 458, 462-463, 465-467, 58 S.Ct. 1019, 1022-1023, 1023-1024, 82 L.Ed. 1461 [1838]; Peralta v. Heights Medical Center, Inc., ___ U.S. ___, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 [1988] and Pettit v. American Nat. Bank of Austin, Okl., 649 P.2d 525, 529 [1982]. In Pettit the court allowed a foreign judgment to be attacked collaterally on due process grounds for lack of jurisdiction. Similarly, the mother here is attacking the validity of the proceeding applied against her and seeks to invalidate all the proceedings for want of due process in the initial notice-giving stage. This asserted error is not a procedural defect to be reached by an objection but rather a facially apparent jurisdictional infirmity.
[11] It is clear from extant case law that preadjudicative custody cognizance is structured by statute to give the trial court jurisdiction over the child while the parental status is clouded. See York v. Halley, Okl., 534 P.2d 363, 364-365 [1975], in which this court's treatment of due process violations at the preadjudicative stage of the deprived status proceedings indicates its recognition of the separate nature of the preadjudicative and merits jurisdictional stages.
[12] The rule that error sought to be presented on appeal must be preserved in the record by objection applies to issues in the adversary evidentiary process. See Wilson v. Levy, 140 Okl. 74, 282 P. 679, 681-682 [1929] and State Nat. Bank v. Lokey, 122 Okl. 82, 240 P. 101, 103 [1925]. On the other hand, the scope of review deals with the available breath of corrective relief that may be afforded in a given case. See Mayhue v. Mayhue, Okl., 706 P.2d 890, 892-893, 895 [1985], where the scope of review was limited by the judgment roll; see also Mobbs v. City of Lehigh, Okl., 655 P.2d 547, 549 [1982] and Timmons v. Royal Globe Ins. Co., Ok., 713 P.2d 589, 591 [1986], where in a post-appellate posture the scope of subsequent review was held to be confined by the settled law of the case.
[13] Matter of C.G., supra note 9 at 69; Faulkenberry v. Kansas City Southern Ry. Co., Okl. 602 P.2d 203, 206-207 [1979]; Carnley v. Cochran, 369 U.S. 506, 515, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 [1962] and Johnson v. Zerbst, supra note 10, 304 U.S. at 464, 58 S.Ct. at 1023.
[14] In Peralta v. Heights Medical Center, Inc., supra note 10, 108 S.Ct. at 900, the Court reversed a Texas court decision which held that a default judgment entered without proper notice must stand absent a showing of a meritorious defense to the action. The Court found that a judgment entered without notice was constitutionally infirm and that this infirmity could only be corrected by "wiping the slate clean" in order to restore the petitioner to the position he would have occupied had due process of law been accorded to him in the first place. The Court noted that if an individual is deprived of his right to due process "it is answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits." Peralta, supra note 10, quoting from Coe v. Armour Fertilizer Work, 237 U.S. 413, 424, 35 S.Ct. 625, 629, 59 L.Ed. 1027 [1915]. The meritorious-defense requirement does not serve as a barrier to the appellant's constitutionally protected right to notice in the trial court proceeding.
[15] 25 U.S.C. § 1912 [1982].
[16] Guidelines, D.4(b), infra at 67,593.

In 25 U.S.C. § 1952 the ICWA authorizes the Secretary of Interior to establish regulations necessary to implement the Act. Through the Bureau of Indian Affairs, ["BIA"], the Secretary has issued mandatory rules and recommended guidelines for application of the ICWA. The rules are limited to narrow issues within the Act. See 25 C.F.R. §§ 13.1-13.16, 2.1-23.93 [1987] The guidelines cover a broader range of subjects. See Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed.Reg. 67,584-95 [1979] [Guidelines.] See also Trentadue and DeMontigny, The Indian Child Welfare Act of 1978: A practitioner's Perspective, 62 N.D.L.Rev. 487, 518-521 [1986].
[17] Guidelines, D.3(b), and commentary, supra note 16 at 67,592.
[18] In re Welfare of Fisher, 31 Wash. App. 550, 643 P.2d 887, 888 [1982], the Washington Court of Appeals affirmed a state court's termination of Indian parental rights and held that the caseworker qualified as an expert witness because she had counseling experience at an Indian center.

In State ex rel. Juv. Dept. v. Charles, 70 Or. App. 10, 688 P.2d 1354, 1360 [1984] the court held that testimony from social workers without Indian experience did not comply with the intent of ICWA. The court reversed the trial court's decision to remove the child from the mother because the state failed to show that serious emotional or physical harm to the child was likely to occur.
In re Dependency of Roberts, 46 Wash. App. 748, 732 P.2d 528, 533 [1987], the court affirmed the termination of Indian parental rights and found that the caseworker was a qualified expert witness because she had experience and training in Indian child welfare. See also Matter of M.E.M. infra note 21 at 1317-1318.
[19] State ex rel. Juv. Dept. v. Charles, supra note 18 at 1360.
[20] D.W.H v. Cabinet for Human Resources, 706 S.W.2d 840, 843 [Ky.App. 1986]. The court affirmed the termination of an Indian parent's custody even though the expert witnesses did not have any special knowledge of Indian society.
[21] Matter of M.E.M., 635 P.2d 1313, 1318 [Mont. 1981].
[22] 25 U.S.C. § 1901(5) [1982]; see also, State v. ex rel. Juv. Dept. v. Charles, supra note 18 at 1359, n. 3, and 1360.
[23] 25 U.S.C. § 1902 [1982].
[24] 25 U.S.C. § 1915(b) [1982]. The terms of § 1915(a) provides that in adoption proceedings preference should be given to:

"1) a member of the child's extended family;
(2) other members of the Indian child's tribe; or
(3) other Indian families."
[25] In re Interest of Bird Head, 213 Neb. 741, 331 N.W.2d 785, 791 [1983].
[26] 25 U.S.C. § 1911(b) [1982]. This section allows a transfer to the tribal court to be denied if either parent objects or the trial court declines to assume jurisdiction.
[27] See legislative History, Indian Child Welfare Act of 1978, H.R.Rep. No. 1386, 95th Cong.2d Sess., p. 21 [1978], U.S.Code Cong. 7 Admin. News 1978, p. 7543.
[28] Jones, Indian Child Welfare; A Jurisdictional Approach, 21 Ariz.L.Rev. 1123, 1142 [1979].
[29] See Legislative History, supra note 27 at 21.
[30] See Guidelines, infra note 16.
[31] Guidelines, supra note 16 at 67,591 (Introduction).
[32] Guidelines, C.2 and C.3(d), supra note 16 at 67,590-67,591.
[33] Guidelines, C.2 and C.3(d), supra note 16 at 67,590-67,591.
[34] The terms of Guidelines, C.3(b)(i-iv), supra note 16 at 67,591, are:

"(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.
(ii) The Indian child is over twelve years of age and objects to the transfer.
(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.
(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe."
The Guidelines, supra note 16, also provide that a transfer should not be denied on the basis of socio-economic conditions, the adequacy of tribal social services, or the adequacy of the tribal court system. Guideline C.3(c), supra note 16 at 67,591. If there is no tribal court as defined by the Act, then the transfer may be denied. Guideline C.3(a), supra note 16 at 67,591. Tribal court is defined by the ICWA as a Court of Indian Offenses or a court established under the custom of a tribe, or any tribal administrative body which has authority over child custody determinations. 25 U.S.C. § 1903(12) [1982].
[35] In Interest of J.R.H., 358 N.W.2d 311, 317 [Iowa 1984]. The Supreme Court of Iowa upheld the state court's refusal to transfer the action to a tribal court that was located in South Dakota. The court found that good cause to deny transfer could be based on "geographical obstacles." The state agency had extensive contact with the family and the majority of the evidence and witnesses were located in Iowa. See also note, In re Junious M.: The California Application of the Indian Child Welfare Act, 8 J.Juv.Law 74, 84 [1984]; Stetson, Conflict of Laws: The Plurality of Legal Systems: An Analysis of 25 U.S.C. § 1901-63, The Indian Child Welfare Act, 8 Am.Indian L.Rev.333, 358 [1980] and Jones, supra note 28 at 1139.
[36] Matter of Adoption of Baby Boy L. 231 Kan. 199, 643 P.2d 168, 178 [1982]. The Supreme Court of Kansas held hat the ICWA was not applicable to adoption proceedings that concerned an illegitimate child of a non-Indian mother. The child had never been in the care of the Indian father and the mother objected to a transfer of the action to the tribal court. The court found that even if the Act were applicable, there would be good cause to deny transfer because all of the parties were located in the county of the state court and they had no connection with the tribal court. See also, In re Interest of Bird Head, supra note 25 at 790. The Indian child's maternal aunt appealed from a state court decision that terminated parental rights and placed the child with the public welfare department for adoption. The Supreme Court of Nebraska affirmed the trial court's denial of the aunt's request to transfer the action to the tribal court. The denial was proper because most of the witnesses resided in the county of the state court.
[37] Matter of M.E.M., supra note 21 at 1317. The Supreme Court of Montana reversed the trial court's decision to terminate parental rights of and Indian mother because counsel had not been appointed for her. As to the question of transfer, the appellate court directed the trial court to consider BIA guidelines, but said that "in addition thereto the best interests of the child could prevent transfer of jurisdiction upon a `clear and convincing' showing by the State."
[38] Matter of M.E.M., supra note 21 at 1317.
[39] The mother's address at the time of trial, according to the Okmulgee County Welfare Department, was Oklahoma County, but the caseworker noted that she had moved frequently and could not be found at the latest address she had given. The Court of Tribal Offenses is located in Tonkawa, and is thus not any more convenient for the mother to reach than the Okmulgee County court.
[40] It is also possible that another BIA factor is present in this case to suggest that a transfer is not warranted. Guideline C.1, supra note 16 at 67,590, requires that a petition to transfer be promptly filed. The mother's transfer request was not filed until one year after she made her first court appearance, which was two years after the initial emergency order was rendered. The BIA guidelines recognize the disruptive effect of untimely transfer requests.

Additionally, a transfer may be denied because § 1918(a) of the ICWA has not bene satisfied. The terms of § 1918(a) provide in pertinent part:
"Any Indian tribe which became subject to State jurisdiction pursuant to the provisions of the Act of August 15, 1953... . or pursuant to any other Federal law, may reassume jurisdiction over child custody proceedings. Before any Indian tribe may reassume jurisdiction over Indian child custody proceedings, such tribe shall present to the Secretary for approval a petition to reassume such jurisdiction which includes a suitable plan to exercise such jurisdiction." [Emphasis added.]
The BIA regulations specifically state what must be included in the tribe's petition to the Secretary, what is to be considered in the Secretary's decision on the matter and how the decision is to be reviewed. 25 C.F.R. 13.11-13.16 [1987]. Section 1918(a) was invoked in Native Village of Nenana v. Dept. of Health, 722 P.2d 219, 221 [Alaska 1986], which concerned whether an Indian child was in need of aid. Transfer of the action to the tribal court was denied because the tribe had not complied with § 1918(a). The court held that the ICWA was not intended to grant jurisdiction to Indian tribes until the Secretary had satisfactory proof that the tribe had the ability to adjudicate properly the case.