105 P.3d 354 (2005)
2005 OK CIV APP 5
In the Matter of T.H., M.B., and J.M.B., Alleged Deprived Children.
Carrie Busenbark, Appellant,
v.
State of Oklahoma, Appellee.
No. 100,822.
Court of Civil Appeals of Oklahoma, Division No. 1.
January 20, 2005.
*355 Henry Herbst, Norman, OK, for Appellant.
Robin K. Wilson, Assistant District Attorney, Norman, OK, for Appellee.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 1.
Opinion by KENNETH L. BUETTNER, Presiding Judge.
¶ 1 Appellant Carrie Busenbark appeals from the trial court's order terminating her parental rights in her children, T.H., M.B., and J.M.B. (Children). The State sought immediate termination of Busenbark's parental rights pursuant to 10 O.S.2001 § 7006-1.1(A)(10), alleging Busenbark failed to protect the Children from heinous and shocking physical abuse. At trial, the court found that the Children were subject to the Indian Child Welfare Act (ICWA) and that the State had met the requirements of ICWA. The trial court found the State had shown beyond a reasonable doubt that termination of Busenbark's parental rights was in the best interests of the Children. The court therefore terminated Busenbark's parental rights. We affirm.
¶ 2 In a case subject to ICWA, the State must prove the grounds for termination beyond a reasonable doubt. 25 U.S.C. § 1912(f). Our task on appeal is to determine if the state presented sufficient evidence to meet that burden.
¶ 3 Busenbark testified she met James Hudson, the father of the Children, in 1996 in Texas. When Busenbark met Hudson, he had been charged with abusing his son. Busenbark attended Hudson's trial while she was pregnant with T.H. and heard the evidence against him.[1] While Hudson was incarcerated in Texas, Busenbark continued correspondence with him. T.H. was born May 31, 1997.
¶ 4 When T.H. was two years old, Hudson lived with Busenbark briefly and during that time, Texas Family Services removed T.H. from the home for six months. During the Texas deprived proceeding involving T.H., Busenbark was put on a treatment plan and attended required parenting classes. The Texas court ordered Busenbark to stay away from Hudson.
¶ 5 In June, 2001, Busenbark and T.H. moved to Norman, Oklahoma.[2] Hudson later came to Norman and Busenbark became pregnant with M.B., who was born March 13, 2002. On June 25, 2002, Busenbark left M.B. with Hudson while she went to a work training class required for TANF recipients.[3]
¶ 6 When Busenbark arrived home that day, M.B. had a large bruise on her head and she was limp. Busenbark took the baby to Norman Regional Hospital. She left there about an hour later, after telling the hospital she needed to pick up T.H. from daycare. Busenbark testified that after she had retrieved T.H., she planned to go home and ask Hudson to go with her to the hospital because she had decided Hudson's story about how M.B. was injured did not make sense. Busenbark arrived home to find Hudson gone. She concluded he had gone to Texas and she took T.H. to Texas to try to find Hudson. Busenbark explained that she fled because she did not want to "take the fall" for what Hudson did to M.B. She also testified she believed that if she found him she could then explain to the authorities that she did not injure M.B.
¶ 7 Because of the severity of her injuries, M.B. was moved to Children's Hospital. Busenbark never called to check on the condition of her injured three-month old. In August 2002, Texas authorities discovered Hudson, Busenbark, and T.H. hiding in a *356 closet in a home in Texas.[4] They were returned to Oklahoma, where T.H. was placed in foster care and Hudson and Busenbark faced felony child abuse charges for injuring M.B. J.M.B. was born April 15, 2003. Shortly after his birth, the Children were placed together in one foster home where they remained at the time of trial.
¶ 8 Hudson relinquished his parental rights in the Children before trial. Busenbark testified she was convicted of committing injury to M.B. and was sentenced to "three years in, seven years out." Busenbark testified she will first be eligible for parole in May 2005. Busenbark agreed she made a mistake leaving M.B. in Hudson's care, but at that time, she did not believe he was a violent person.
¶ 9 Francie Roughface, the Indian Child Welfare Coordinator for the Pawnee Nation, testified that due to changes in the Pawnee Nation's blood quantum requirement, the Children are now considered Indian children subject to ICWA. The trial court recognized Roughface as an expert witness for purposes of ICWA. Roughface testified that she had not met the Children, but she kept up with the case through the DHS caseworker, Michele Bellamy. Roughface testified the Children's rights under ICWA had been protected in this case. Roughface agreed with the State's decision to seek termination because the tribe does not condone child abuse. Roughface believed physical harm would come to the Children if they were returned to Busenbark's custody. Roughface testified that permanency is the tribe's priority for the Children. Roughface explained that the tribe recommended termination of Busenbark's parental rights, and she indicated the tribe would stay involved with the Children until permanency had been established. Roughface testified to her belief that a treatment plan and rehabilitative efforts would not be effective in this case, and to her belief that immediate termination was in the Children's best interests.
¶ 10 The DHS caseworker, Michele Bellamy, had been involved with the Children since July 2002. Bellamy explained that DHS became involved when M.B. was taken to the hospital June 25, 2002, where she was diagnosed with shaken baby syndrome. Bellamy explained that M.B. had severe bruising and subdural hematomas. T.H. was placed in DHS custody after she was found with Hudson and Busenbark in Texas on August 21, 2002. During the two months between M.B. being injured and the arrests of Hudson and Busenbark, neither parent contacted DHS. J.M.B, who was born while Busenbark was incarcerated, was placed in DHS custody soon after his birth.
¶ 11 Bellamy explained that in October 2002, the maternal grandmother had custody of T.H. and M.B. for two weeks, but she returned them to DHS after deciding she could not care for them. Bellamy explained that the maternal grandfather and his wife considered taking the Children, but they were concerned that M.B. would have long-term injuries and they did not want to care for her. Bellamy explained that T.H. has behavioral problems, but no medical problems. M.B. was being tested for hearing loss at the time of trial. Bellamy testified T.H. had expressed no desire to return to Busenbark's care, and M.B. and J.M.B. have no memory of Busenbark because they were small infants when they were removed from her care.
¶ 12 Bellamy had reviewed the Texas child welfare proceedings involving T.H. Bellamy concluded that rehabilitative efforts would not be appropriate in this case because Busenbark had previously gone through a parenting class in Texas. Bellamy also testified that based on the history of this case, DHS could not propose a treatment plan which would be effective or lead to reunification or provide for the safety of the Children. Bellamy concluded from Busenbark's history that she would continue to expose the Children to risk and that the Children would never be safe in Busenbark's care. Bellamy testified that in addition to the risks to the Children's safety presented by Busenbark, another factor in her recommendation of termination was the lack of any bond between the Children and Busenbark. Bellamy testified that *357 termination of parental rights was in the Children's best interests.
¶ 13 The State filed its Petition July 5, 2002, while M.B. remained hospitalized and T.H. remained hidden in Texas with Busenbark. The State sought termination under 10 O.S.2001 § 7006-1.1(A)(10), based on Busenbark's failure to protect the Children from heinous and shocking physical abuse.[5] At trial, the parties disputed whether the Indian Child Welfare Act (ICWA) applied. The trial court ultimately decided ICWA did apply to the Children in this case. At the conclusion of trial, the court announced its finding that the State had met its burden of proving the grounds for termination beyond a reasonable doubt. In its Order Terminating Parental Rights, the trial court found that Busenbark wholly failed to protect M.B. from heinous and shocking physical abuse, and that T.H. and J.M.B. are at risk due to Busenbark's failure to protect them from physical abuse. The court found that efforts to reunite the family were not feasible and that termination of Busenbark's parental rights was in the Children's best interests. The trial court also found that termination was consistent with the preservation and protection of the interests of the Indian children, Indian tribe, and Indian family.
¶ 14 We address Busenbark's last allegation of error first. She contends that the trial court erred in finding her actions heinous and shocking because she was not the perpetrator of the abuse to M.B. and was not present when M.B. was abused June 25, 2002. This argument is wholly without merit. Section 7006-1.1(A)(10)(a) provides that parental rights may be terminated for failure to protect a child from heinous and shocking abuse. Nothing in the statute requires that Busenbark be the actual physical abuser. Busenbark's own testimony shows that she was on notice, beginning before T.H. was born, that Hudson was capable of severe and violent abuse to his children. Busenbark had been ordered by the Texas courts to stay away from Hudson and she had previously lost custody of T.H. because she exposed T.H. to Hudson. Busenbark's testimony also shows that after the abuse to M.B., Busenbark was more concerned with staying out of prison than she was with the health of her three month old baby. Busenbark's testimony showed a complete lack of interest in protecting her children from abuse that was heinous and shocking. We hold the trial court's finding that the State proved the grounds for termination beyond a reasonable doubt was not in error.
¶ 15 Busenbark next raises two allegations of error regarding compliance with ICWA. When the State seeks to terminate parental rights under § 7006-1.1(A)(10), termination may be ordered without offering the parent a treatment plan or a list of conditions to correct. However, one of the provisions of ICWA states that termination of parental *358 rights in children subject to the act may only be effected after remedial services have been offered.[6] At issue here is whether immediate termination under the state statute may be ordered in light of the ICWA requirement of offering remedial services.
¶ 16 Busenbark acknowledges that she went through a treatment plan previously in Texas. That plan was ordered because Busenbark continued to allow Hudson to live with her and T.H., despite his conviction for severely abusing his son. It also was undisputed that Busenbark was either hiding from the authorities or incarcerated during the entirety of this proceeding. And, as noted above, Busenbark effectively abandoned M.B. when she left the hospital June 25, 2002 and failed to make any effort to see her child or even inquire as to her condition or safety. The facts of this case show that remedial services would have been futile. The Missouri Court of Appeals has noted that where the natural parents failed to take advantage of opportunities to visit the child and failed to show any interest in the child, the remedial services offered were futile. In the Matter of C.E.H., 837 S.W.2d 947 (Mo.App.1992).[7] In People in Interest of J.J., 454 N.W.2d 317, 325 (S.D.1990), the custodial grandmother appealed the termination of her custodial rights, and alleged that the state had failed to offer the remedial services required by § 1912(d). The South Dakota Supreme Court found that the child had been raped by an uncle while living with the grandmother, and that the grandmother was intoxicated at the time and failed to protect the child. Id. The court noted that the family had a lengthy involvement with family services and the grandmother continued to expose the children to dangerous relatives. Id. The court was at a loss as to what programs the state could have offered to remedy the situation. Id. In response to the same argument, the South Dakota Supreme Court explained in People in Interest of P.B., 371 N.W.2d 366, 372 (S.D.1985):
it is clear that Department has satisfied this burden. It attempted to educate K.B. in the rudiments of child-caring techniques even before P.B.'s birth. Department continued these efforts after P.B.'s birth, only to have K.B. spurn them by returning to the deleterious environment of her mother's home, from which Department had tried to insulate her. After P.B.'s removal from that environment, Department persisted in its efforts to assist K.B. in developing her maternal skills and to overcome her alcohol and chemical addictions, to no avail. K.B. is not responsible for her less than average intelligence or her psychological impoverishment, but neither is Department charged with the duty of persisting in efforts that can only be destined for failure.
In this case, Busenbark went through a treatment plan in Texas and the Texas courts directed her to stay away from Hudson. Busenbark had notice of Hudson's violent abuse of his children. Nevertheless, Busenbark continued to be involved with Hudson, she refused to believe he was violent, and she left *359 her small infant with Hudson, which resulted in another innocent child suffering severe injuries at the hands of Hudson. Considering the lack of results from the Texas remedial services, like the court in J.J., we are at a loss for what other remedial services may have been offered to prevent recurrence of physical abuse to Busenbark's children if they were returned to her care.[8] Other courts have also held that where reasonable efforts have been made and the parent fails to cooperate with the services offered, and there is no evidence that additional efforts would be productive, then § 1912(d) has been satisfied. See K.N. v. State, 856 P.2d 468, 477 (Alaska, 1993); In re Brown, 112 Idaho 901, 736 P.2d 1355, 1358 (1987). It finally bears noting again that the Pawnee Nation's representative testified that the tribe found termination was in the Children's best interests, and the tribe's position was that further remedial services would not be effective to protect the Children from further abuse in Busenbark's custody. We find no error in the failure to afford further remedial services to Busenbark under these facts.
¶ 17 Busenbark's remaining argument is that Roughface was not qualified to give an expert opinion. Whether to qualify a witness as an expert for purposes of ICWA is within the trial court's discretion. Matter of Welfare of T.J.J., 366 N.W.2d 651 (Minn.App.1985); In re Welfare of Fisher, 643 P.2d 887, 31 Wash.App. 550 (1982). At trial, Busenbark objected to Roughface being recognized as an expert under ICWA because Roughface does not have a master's degree. Busenbark admits that her argument is without merit based on the holding in Matter of N.L., 1988 OK 39, 754 P.2d 863. In N.L., the court noted that the Bureau of Indian Affairs guidelines indicate that a qualified expert in ICWA cases includes "A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices." 754 P.2d at 867. The requirement of substantial education and experience applies to non-Indian expert witnesses. Id. We find no error in qualifying Roughface as an expert for purposes of ICWA in this case. Busenbark argues also that it was error to base termination on Roughface's testimony because she had not met the Children. Busenbark has failed to cite authority holding that the Indian expert must have met the children at issue before rendering an expert opinion for purposes of satisfying ICWA. Roughface testified that she had discussed the case with Bellamy, she testified the tribe would not condone physical abuse, and that the tribe concurred in the recommendation to terminate parental rights. We find no error in the admission of Roughface's testimony.
AFFIRMED.
HANSEN, J. (sitting by designation), and ADAMS, J., concur.
NOTES
[1] Busenbark explained that the son Hudson abused had been left blind and was "basically a human vegetable because of" the abuse. Busenbark learned this information before the abuse that instigated the instant proceedings.
[2] In 2000, Busenbark married another man, to whom she was still legally married at the time of trial in this case. Busenbark testified that her husband had been on the run from Texas authorities following a sexual molestation charge.
[3] Busenbark testified that Hudson did not live with her in Norman until shortly before this incident. On June 25, 2002, Busenbark took T.H. to daycare, but M.B. had been fussy the day before and the daycare asked Busenbark not to bring M.B. to daycare on June 25. Busenbark intended for Hudson to care for M.B. for 30 minutes to an hour and then deliver her to a neighbor who had agreed to care for her. Busenbark had no explanation for why Hudson failed to take M.B. to the neighbor's.
[4] Busenbark was then pregnant with J.M.B. Busenbark testified that she was being held by Hudson against her will and that the pregnancy was the result of Hudson raping her.
[5] That subsection provides:

A. Pursuant to the provisions of the Oklahoma Children's Code, the finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations; provided, however, the paramount consideration in proceedings concerning termination of parental rights shall be the health, safety or welfare and best interests of the child:
* * *
10. A finding in a deprived child action either that:
a. the parent has physically or sexually abused the child or a sibling of such child or failed to protect the child or a sibling of such child from physical or sexual abuse that is heinous or shocking to the court,
b. the child or sibling of such child has suffered severe harm or injury as a result of such physical or sexual abuse,
c. the parent has physically or sexually abused the child or a sibling of such child or failed to protect the child or a sibling of such child from physical or sexual abuse subsequent to a previous finding that such parent has physically or sexually abused the child or a sibling of such child or failed to protect the child or a sibling of such child from physical or sexual abuse,
d. the child has been adjudicated a deprived child, pursuant to the provisions of the Oklahoma Children's Code, as a result of a single incident of severe sexual abuse, severe neglect or the infliction of serious bodily injury or torture to the child, a sibling of the child, or a child within the household where the child resides, by the parent of the child, or
e. the parent has inflicted chronic abuse, chronic neglect or torture on the child, a sibling of the child or another child within the household where the child resides;
[6] 25 U.S.C.A. § 1912(d) "Remedial services and rehabilitative programs; preventive measures" provides:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
[7] C.E.H. differs from the instant case in that in C.E.H., remedial services were offered, but the natural mother showed those efforts to be futile by leaving the state with the child and abandoning the child with one of his grandparents. The court in C.E.H. noted that the lack of the father's involvement, coupled with the mother's attempts to abandon the child and failure to visit the child raised the question of the existence of an Indian family for ICWA to preserve. 837 S.W.2d at 957. In this case, neither party has challenged the applicability of ICWA, but we note there was no evidence of an existing Indian family. The evidence showed only that the Children had recently become members of the Pawnee Nation based on a change in the blood ratio requirements for tribal membership. Busenbark offered no testimony related to her Indian heritage. One document in the record indicates the Children are Indian as a result of their relation to Hudson. The Oklahoma Supreme Court has held that ICWA should not apply where there is no existing Indian family, because the purpose of ICWA is to prevent the breakup of existing Indian families. Matter of S.C., 1992 OK 98, 833 P.2d 1249, 1256.
[8] It also bears noting that Busenbark could not have completed a treatment plan because she was incarcerated during the entirety of this proceeding. In People ex rel. D.G., 679 N.W.2d 497, 502 (S.D.2004), the court noted that a parent's incarceration does not excuse the state from offering remedial services, but the court noted that incarceration may limit the state's ability to afford remedial services.