No. 81-101

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

IN THE MATTER OF M.E.M.
YOUTH IN NEED OF CARE.

---

Appeal from:  District Court of the Thirteenth Judicial District,
              In and for the County of Yellowstone.
              Honorable Diane G. Barz, Judge presiding.

Counsel of Record:

    For Appellant:

        Steve Bunch argued, Legal Services, Helena, Montana
        D. Michael Eakin argued, Legal Services, Hardin, Montana

    For Respondent:

        Harold F. Hanser, County Attorney, Billings, Montana
        Robert P. Morin argued, Deputy County Attorney, Billings,
         Montana
        Olsen, Christensen and Gannett, Billings, Montana
        Damon Gannett argued, Billings, Montana

---

                        Submitted:  September 14, 1981

                          Decided:  November 12, 1981

NOV 12 1981

Filed:

_Thomas J. Kearney_
_____
                        Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

This is a dependency and neglect action involving a Sioux Indian child. The case requires application of the Indian Child Welfare Act of 1978, Pub. L. No. 95-608, 92 Stat. 3069 (codified at 25 U.S.C.A. sections 1901-1963, West Supp. 1979). All parties agree to its application. The parental rights of the child's mother, also an enrolled tribal member, were terminated by order of the District Court February 26, 1981. She appeals from that judgment.

M.E.M., age 5, and her natural mother are members of the Standing Rock Sioux Indian Tribe. The mother has an IQ of approximately 53 and receives supplemental security income (S.S.I.) payments. The natural father is deceased. When this action was commenced the mother and M.E.M. were living in Billings, Montana. The mother now resides on the reservation. M.E.M. remains in the foster care of the State.

Petition for temporary investigative authority and protective services was filed by the county attorney August 22, 1979, in the Thirteenth Judicial District, Yellowstone County. The State alleged M.E.M. was in danger of being neglected and abused. A petition for permanent custody and authority to assent to adoption was subsequently filed October 4, 1979. A citation directing the mother to appear at a hearing in the District Court on December 21, 1979, was served upon her October 18, 1979, at Aberdeen, South Dakota. The District Court appointed a guardian ad litem for M.E.M. on October 11. The District Court did not appoint counsel for the mother.

The Standing Rock Tribal Court was notified of the pending action by a Yellowstone County social worker who sent certified letters to the Tribal Court on September 12 and October 15, 1979. The Tribal Court responded October 23 with a letter to the social worker stating that the tribal court would assume jurisdiction and requested arrangements be made for the return of M.E.M. to

- 2 -

the Tribal Court.

The Tribal Court was informed by letters dated November 6 and 30 that the county welfare department would resist transfer of jurisdiction unless the Tribal Court's "plans for the disposition of the case" were first stated. The Tribal Court did not respond to these demands.

On December 11, the welfare department sent a mailgram to the mother stating the show cause hearing would be held in the District Court as scheduled. The mother, then residing on the Standing Rock Reservation, sought the assistance of the Tribal Court, pro se. The Tribal Court issued an order directing the District Court to return custody of M.E.M. to the tribe. The order of the Tribal Court was filed with the District Court December 21 but shortly after the time of the hearing.

Present at the hearing were the guardian ad litem, a deputy county attorney, a welfare social worker and a representative of Social and Rehabilitation Services. The mother did not appear and was not represented by counsel. The tribe was not represented either, ostensibly assuming its order would effect the transfer of jurisdiction.

The only witness called by the State was the social worker who recounted her unsuccessful efforts to assist the mother in developing proper parenting skills. She alleged that on several occasions the mother used excessive corporal punishment and that two of the child's uncles had sexually abused the child. She further alleged the mother had been accused of prostitution by employees of the Rescue Mission in Billings, where the mother frequently sought emergency housing, and that she was unable to support herself through any proper employment. The social worker recommended permanent removal and adoptive placement. The District Court took the matter under advisement.

After receiving the tribal order the State resisted transfer and requested a further hearing claiming the tribal

order contained "numerous errors of law and [did] not constitute a request to assume jurisdiction under the provisions of the Indian Child Welfare Act." The District Court set March 13, 1980, as the date for further hearing on the issue of termination of parental rights and transfer of jurisdiction.

Through the assistance of the Tribal Court the mother retained Montana Legal Services (MLS) as counsel on March 1, 1980. The mother was represented by MLS at the second hearing, but the Tribal Court was unable to send a representative.

Over the objection of the mother's counsel, who argued the hearing should be limited solely to the question of jurisdiction, a cousin of the mother testified about her discovery of the alleged sexual abuse and her belief that if the child were returned to the mother or tribal authorities the child would certainly be placed in a situation on the reservation which would result in further sexual abuse by the uncles. The social worker added testimony regarding a series of communications with tribal authorities. After the submission of briefs by the parties the District Court held on June 13, 1980, that it had proper jurisdiction, denied transfer of jurisdiction to the Tribal Court and ordered temporary custody remain with the State until a final order was entered. The mother made application to this Court for writ of supervisory control requesting transfer of jurisdiction, which was denied September 17, 1980. Judgment awarding permanent custody and control to the State and authority to assent to adoption was entered February 27, 1981. Notice of appeal was timely filed March 3, 1981.

The appellant contends the District Court erred by (1) failing to appoint counsel for the appellant, (2) refusing to transfer jurisdiction to the Tribal Court, and (3) terminating parental rights without testimony from a "qualified expert." The appellant's challenges originate under the Indian Child Welfare Act.

The Indian Child Welfare Act of 1978 was passed by Congress in response to a significant threat to the integrity of Indian cultures in this country. The Act represents Congressional recognition of the concomitant cultural interests of Indian tribes and Indian children; interests fundamental to the perpetuation and preservation of their mutual and valuable heritage. Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions . . ." 25 U.S.C.A. § 1901(4). We share that concern.

Each individual is an amalgam of the predominant religous, linguistic, ancestral and educational influences existent in his or her surroundings. Indian people, whether residing on a reservation or not, are immersed in an environment which is in most respects antithetical to their traditions. Furthermore the cultural diversity among Indian tribes is unquestionably profound yet often not fully appreciated or adequately protected in our society. Our constitution recognizes "the distinct and unique cultural heritage of the American Indians and is committed in its educational goals to the preservation of their cultural integrity." 1972 Mont.Const., Art. X, §1(2). Preservation of Indian culture is undoubtedly threatened and thereby thwarted as the size of any tribal community dwindles. In addition to its artifacts, language and history, the members of a tribe are its culture. Absent the next generation, any culture is lost and necessarily relegated, at best, to anthropological examination and categorization. In applying our state law and the Indian Child Welfare Act we are cognizant of our responsibility to promote and protect the unique Indian cultures of our state for all future generations of Montanans.

For further discussion of the act see: Note, In Re D.L.L. &

C.L.L., Minors: Ruling on the Constitutionality of the Indian Child Welfare Act, 26 S.D.L.Rev. 67-78 (1981); Note, The Indian Child Welfare Act of 1978: Provisions and Policy, 25 S.D.L.Rev. 98-115 (1980); Guerrero, Indian Child Welfare Act of 1978 A Response to The Threat to Indian Culture Caused by Foster and Adoptive Placement of Indian Children, 7 Am.Indian L.Rev. 51-77 (1980); Jones, Indian Child Welfare: A Jurisdictional Approach, 21 Ariz.L.Rev. 1123-1145 (1979); Barsh, The Indian Child Welfare Act of 1978: A Critical Analysis, 31 Hastings L.J. 1287-1336 (1980); Wamser, Child Welfare Under the Indian Child Welfare Act of 1978: A New Mexico Focus, 10 N.M.L.Rev. 413-429 (1980).

### Appointment of Counsel for the Natural Mother

Appellant contends the District Court erred by failing to appoint counsel for the mother. The evidence presented at the December 21 hearing showed the mother was developmentally disabled and the recipient of S.S.I. payments; therefore under the Act the mother was entitled to appointment of counsel.

The State concedes the mother was entitled to appointment of counsel by both the Act and our own statutes, section 41-3-401(12), MCA (discretionary appointment); however, argues the State, she never requested counsel therefore no error was committed.

The applicable section of the Act is 25 U.S.C. § 1912(b), which states:

> "(b) In any case in which the court determines indigency, the parent or Indian custodian shall have the right to court-appointed counsel in any removal, placement, or termination proceeding. The court may, in its discretion, appoint counsel for the child upon a finding that such appointment is in the best interest of the child . . ."

The legislative history of the Act supports the contention of the appellant.

> "The separation of Indian children from their families frequently occurs in situations where one or more of the following circumstances exist: (1) the natural parent does not understand the nature of the documents or pro-

ceedings involved; (2) neither the child nor the natural parents are represented by counsel or otherwise advised of their rights; (3) the agency officials involved are unfamiliar with, and often disdainful of Indian culture and society; (4) the conditions which led to the separation are not demonstrably harmful or are remediable or transitory in character; (5) responsible tribal authorities are not consulted about or even informed of the nontribal government actions." S.Rep. No. 95-597, 95th Cong. 1st Sess. (1977).

We interpret the Act as requiring the appointment of counsel for indigent Indian parents in "child custody proceedings" as defined in the Act. 25 U.S.C. § 1903(1). The second sentence of § 1912(b) allows the District Court discretion in the appointment of counsel for the child. By inference the appointment of counsel in the case of an indigent parent is mandatory. Our liberal interpretation is congruent with the remedial character of the Act and in light of the particular intellectual capacities of this mother we must reject the State's contention that the mother should have requested counsel. Failure of the District Court to appoint counsel was error. We reverse the judgment terminating parental rights and remand this cause for a hearing de novo. In reviewing the record we note much of the testimony given during the first hearing would have been excluded if proper objection had been made. The mother is entitled to a de novo hearing.

## Transfer of Jurisdiction

Our holding returns the parties to their respective positions prior to the December 21, 1979, hearing with the exception that the natural mother will now be represented by counsel. Appellant urges this Court to order immediate transfer of jurisdiction to the Tribal Court. Such a determination would be inappropriate. Because M.E.M. was domiciled in Billings, Montana at the commencement of the proceeding and not on the reservation of her tribe, the extraterritorial jurisdiction of the tribe created by the Act must first be adjudicated. Section 1911(b) of the Act defines the extent of this referral

- 7 -

jurisdiction.

> "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon petition of either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe." (Emphasis added.)

Upon remand the District Court must first decide the jurisdictional issue. The burden of showing "good cause to the contrary" must be carried by the State with clear and convincing evidence that the best interests of the child would be injured by such a transfer. We direct the District Court to consider the guidelines for state courts established by the Department of the Interior in its determination, although in addition thereto the best interests of the child could prevent transfer of jurisdiction upon a "clear and convincing" showing by the State.

## Qualified Expert Testimony

Appellant challenges the termination of the mother's parental rights because the State did not present qualified expert testimony as required by the Act. Section 1912(f) states:

> "No termination of parental rights may be ordered in such proceedings in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

The Act does not define "qualified expert witness." The record shows the expert called by the State in this case had limited experience in the department and one year in the area of childrens' services. We do not here hold that it was error to admit this expert's opinion. In deciding whether there is proper foundation for an expert opinion, the trial court should consider the Department of Interior guidelines which provide:

> "b. Persons with the following characteristics

- 8 -

are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty." 44 Fed.Reg. 67593 (1979).

We are aware that these guidelines add a dimension to expert testimony not normally required. However we feel these guidelines comport with the spirit of the Indian Child Welfare Act and therefore deem them to be applicable.

In conclusion, judgment terminating parental rights is reversed and this case remanded for a hearing de novo. The District Court must first consider the jurisdictional issue and if transfer is denied, then proceed in accordance with this opinion and applicable portions of the Indian Child Welfare Act of 1978.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting:

I dissent from the result of the majority opinion. The cause should be reversed, but it should be reversed with instructions to the District Court to transfer immediately these proceedings to the Standing Rock Sioux Tribal Court of the Standing Rock Sioux Indian Reservation at Fort Yates, North Dakota.

After the proceedings were instituted in the District Court of Yellowstone County, the District Court was served on February 22, 1980, with the following instruments from the Standing Rock Sioux Tribal Court:

1. An authorization for legal representation signed by the mother of the child here.

2. A letter from Thomas J. Gunderson, Chief Judge of the Standing Rock Sioux Tribal Court stating:

> ". . . We are requesting transfer of jurisdiction to this Court pursuant to the provisions of the Indian Child Welfare Act. . ."

3. A copy of the motion by the mother in this case to the Standing Rock Sioux Tribal Court for a transfer proceedings to it from the Yellowstone County District Court.

4. An order dated December 14, 1979, signed by Isaac Dog Eagle, Jr., Tribal Judge of the Tribal Court assuming jurisdiction under the Indian Child Welfare Act.

The social worker of the Department of Public Welfare in Yellowstone County on November 30, 1979 had earlier advised the Standing Rock Sioux Tribal Court that it would not transfer jurisdiction to the Tribal Court upon the following grounds:

> "Please refer to our letter of November 6, 1979 requesting advisement of your plans for the above-named child before any arrangements were made for her to return to the reservation. We

-10-

have not heard from you and our permanent custody hearing date is three weeks away . . ."

In determining "good cause" for refusing transfer of jurisdiction to an Indian Tribal Court, the District Court may not consider socio-economic conditions that eventually may arise out of the disposition by the Tribal Court. The federal guidelines, contained in 44 Fed. Reg. 228 (1979) at p. 67591, state:

> "(c)   Socio-economic conditions and the perceived adequacy of Tribal or Bureau of Indian Affairs Social Services or judicial systems may not be considered in a determination that good cause exists."

The District Court in this case refused to transfer the proceedings to the Tribal Court upon the perceived impression that the child's custody would be given to persons on the reservation with whom the District Court, and the Department of Public Welfare, were not satisfied. This is not the function, however, of a good-cause determination under section 1911(b) of the Indian Child Welfare Act. Those are matters for decision by the Tribal Court and under section 1911(d) of that Act, the United States, every state, and every Indian tribe shall give full faith and credit to the public acts, records and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records and judicial proceedings of any other judicial entity.

The district courts must be prepared to recognize that Indian tribal courts have full power to act in matters of Indian child adoptions and custodial proceedings, not involving divorce, and the jurisdiction of the tribal courts is on a par in those matters with the jurisdiction of the

-11-

district courts of this state. It cannot, in my view, be "good cause," to refuse transfer of the proceedings to a tribal court on the perception that the tribal court may not act with respect to the child in the way we would wish it to act. The purpose of the Indian Child Welfare Act is to remove as far as possible the white man's perceptions in these matters where Indian values may conflict.

I would reverse the case and direct the District Court to transfer the cause forthwith to the Tribal Court that has requested jurisdiction in the proceedings, before a federal court does it for us.

_John C. Sheehy_
Justice