2010 OK 46

**In the Matter of M.S. and K.S., Deprived Children.**

**Puyallup Tribe of Indians, Plaintiff/Appellant,**

v.

**State of Oklahoma, Defendant/Appellee.**

**No. 103,921.**

Supreme Court of Oklahoma.

June 15, 2010.

---

1. *Hough v. Leonard,* 1993 OK 112, 867 P.2d 438.

162

Michael E. Yeksavich, Yeksavich Law Office, Tulsa, OK, and Debra W. McCormick, Eugene K. Bertman, Jennifer McBee, Rubenstein McCormick & Pitts, P.L.L.C., Edmond, OK, for Appellant.

Jerry S. Moore, District Attorney, Gary Huggins, Assistant District Attorney, Michael J. Spychalski, Assistant District Attorney, Wagoner, OK, for Appellee.

Amy B. McFarland, Wagoner, OK, for Minor Children.

*OPINION*

WATT, J.:

¶ 1 In this case we consider a jurisdictional dispute between the tribal court of the Puyallup Tribe of Indians and the courts of this state involving the placement of two Indian children, M.S. and K.S. We previously granted certiorari. We reverse and remand.

**FACTS**

¶ 2 This case began as a deprived child proceeding in August, 2004, when an emergency petition was filed by the State of Oklahoma, ex rel. Department of Human Services, to remove M.S. and K.S. ("the children"), and their two older half-siblings, A.H. and K.H., from their parents' home. M.S. and K.S. are registered members of the Puyallup Tribe of Indians (the Tribe), as is their father. All of the children have the same mother, who is of Cherokee descent, but the two older children have a different father. All four children were placed in a foster home together, but the oldest child, A.H., an enrolled Cherokee member, moved to Texas to live with her biological father. M.S. and K.S. remained in the foster home with their older brother, K.H., also a Cherokee member,[1] for approximately two years. On June 21, 2006, the parental rights of M.S.'s and K.S.'s parents were terminated. The Tribe then filed a petition to transfer the case to its tribal court in Tacoma, Washington, or alternatively, for placement of M.S. and K.S. with their great aunt in Florida, in compliance with the placement preferences in subchapter one of the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901–1923, specifically 25 U.S.C. § 1915(b).[2] The trial court denied its requests, and the Tribe appealed. The Court of Civil Appeals ("COCA") affirmed.

¶ 3 The foster parents (the Simmons) have expressed an interest in adopting K.H., M.S. and K.S., although no petition for adoption had been filed as to M.S. and K.S. at the time this appeal was commenced on October 26, 2006. During the pendency of this appeal, M.S. and K.S. were placed with their great aunt in Tampa, Florida.[3]

¶ 4 After the termination case concluded, the State gave notice to the Simmons of a change in placement. The Simmons filed an objection to removal of the children from their home and requested a hearing. Notice of the hearing was not sent to the Tribe. Although it learned of the hearing, it complains it did not have time to file a written response. After the Simmons' objection to removal was sustained, the court considered the Tribe's motions for transfer and change of placement. After a hearing on September 21, 2006, the trial court denied the Tribe's requested relief. In its September 28, 2006, Order Overruling Petition to Transfer to Tribal Court and Overruling Motion for Placement, the trial court held:

> (ii) a foster home licensed, approved, or specified by the Indian child's tribe;
> (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
> (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

---

1. One of the issues raised by the Tribe is that, in affirming the trial court, COCA considered the "purported concerns" of the Cherokee Nation, despite no interest being claimed by it as to M.S. and K.S.

2. Section 1915(b) provides:
   (b) Foster care or preadoptive placements; criteria; preferences
   Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—
   (i) a member of the Indian child's extended family;

3. On December 19, 2008, a different judge of the district court entered an Order Changing Placement. Subsequently, the Tribe filed its Petition for Rehearing, contending, *inter alia*, that the placement issue is moot and the COCA opinion is merely advisory and should be withdrawn. The Tribe also sought a stay pending appeal which COCA denied. COCA granted the rehearing on July 15, 2009, but found that the new placement order provided that it could be changed at any time and did not permanently resolve the issue.

There is good cause for the Court to decline to transfer jurisdiction to the Puyallup Tribe due to the length of time that the State of Oklahoma has exercised jurisdiction prior to the tribe's motion and the relationships established between the children and their foster parents, their attorney, their CASA, DHS social workers, and medical providers. Furthermore, most relevant evidence regarding the children is located in the State of Oklahoma.

¶ 5 The Tribe's alternative Motion for Placement, in which the Tribe requested placement with the children's biological great aunt residing in Florida, a Puyallup tribal member, was overruled in the same order.

¶ 6 At issue in this case is whether COCA correctly interpreted the ICWA when it affirmed the trial court's order denying the Tribe's motion to transfer jurisdiction to tribal court and its alternative motion for relative placement during the pre-adoption stage of these proceedings. We hold COCA erred: (a) by interpreting the ICWA to preclude tribal court jurisdiction after the parental rights to two Indian children were terminated, (b) by finding "good cause" not to transfer, and (c) by failing to use the "clear and convincing" evidence standard in its review of the trial court's finding of "good cause" to deny the Tribe's requests. We previously granted the Tribe's petition for certiorari. We reverse and remand.

**JURISDICTION**

¶ 7 For purposes of the ICWA, tribal courts have exclusive jurisdiction over "child custody proceedings" involving Indian children who are domiciled within the reservation. See *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (*Holyfield*); 25 U.S.C. § 1911(a) of the ICWA.[4] Indian children of parents domiciled on the reservation are also considered domiciled on the reservation. This was the Court's holding, although the parents tried to avoid the ICWA by going off the reservation for the child's birth. *Holyfield*, 490 U.S. 30, 48–49, 109 S.Ct. 1597, 1608. Thus, because Indian children born off the reservation were considered domiciled on the reservation, the tribal court had exclusive jurisdiction of a voluntary adoption by non-Indian adoptive parents. *Holyfield*, 490 U.S. 30, 49, 109 S.Ct. 1597, 1609.

¶ 8 In contrast to the present case, it is undisputed that neither M.S., K.S., nor their parents, resided on the reservation. We must therefore consider 25 U.S.C. § 1911(b)[5] which concerns jurisdiction over "child custody proceedings" for non-domiciliary Indian children. The Tribe contends transfer to tribal court may occur in this case, absent good cause to the contrary. The State responds that although § 1911(a) applies to "*any* child custody proceeding"[6] involving an

4. 25 U.S.C. § 1911(a) provides:
    (a) Exclusive jurisdiction
    An Indian tribe shall have jurisdiction exclusive as to any State over any *child custody proceeding* involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child. [emphasis added.]

5. 25 U.S.C. § 1911(b) provides:
    (b) Transfer of proceedings; declination by tribal court
    In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of

either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe. [emphasis in original.]

6. "Child custody proceeding" is defined at 25 U.S.C. § 1903(1):
    (i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;
    (ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;
    (iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and

Indian child, § **1911(b)** applies only to transfers of "foster care placement" or "termination of parental rights" proceedings. [emphasis added]

¶ 9 The trial court's denial of transfer to tribal court was based on its findings of "good cause to the contrary," as noted above, but not because the Tribe's transfer request came after the termination proceeding ended. However, in support of the trial court's judgment, the State argued on appeal that because the Tribe did not move to transfer this case to tribal court at the time of the foster care placement or termination of parental rights proceedings, transfer was not required or allowed under § 1911(b). COCA agreed.

¶ 10 The record indicates the timeliness of the motion to transfer jurisdiction was not raised in the trial court but was first raised on appeal. The Tribe argued it could not be considered. COCA held that if the Tribe, **as the Appellant,** had raised an issue for reversal for the first time on appeal, consideration of it would be foreclosed, but that an **Appellee** is free to raise an argument which provides an additional reason to affirm the judgment, citing *McMinn v. City of Oklahoma City,* 1997 OK 154, 952 P.2d 517.

¶ 11 Regardless of the trial court's reasoning, COCA's construction of § 1911(b) constitutes a question of law which affects the intent and purpose of the ICWA. COCA's opinion also denies tribal court jurisdiction over an ICWA proceeding involving two members of its tribe, in favor of Oklahoma courts. It therefore affects our jurisdiction, as well.

### a. Purpose of the ICWA

¶ 12 At issue then is whether § 1911(b) should be construed so narrowly and whether this construction complies with Congressional intent and the purpose of the ICWA. In

arguing that the specific inclusion in § 1911(b) of only "foster care placement" and "termination of parental rights" proceedings indicates an intent to exclude transfers of the other "child custody proceedings" defined by 25 U.S.C. § 1903,[7] the State promotes the rule of *"expressio unius est exclusio alterius,"* i.e., the mention of one thing in a statute implies exclusion of something else. See gen., *Spiers v. Magnolia Petroleum Co.,* 1951 OK 276, ¶ 21, 206 Okla. 510, 244 P.2d 852, 856. However, the rule should be applied only as an aid in arriving at intention and should never be followed when doing so would override the intended purpose of the act. *Public Service Company of Oklahoma v. State ex rel. Corporation Commission,* 1992 OK 153, 842 P.2d 750. COCA agreed with the State that a transfer to tribal court at the "preadoptive placement" stage was precluded because § 1911(b) does not mention it. We acknowledge § 1911(b) mentions transfers of only "foster care placement" and "termination of parental rights" proceedings "in the absence of good cause to the contrary...." We must therefore determine whether Congress intended to *exclude* transfers of "pre-adoptive placement" and "adoptive placement" proceedings to tribal court.[8]

¶ 13 We must read § 1911(b) as it is written. The court "shall transfer" foster care placement and termination of parental rights proceedings absent objections and a showing of good cause to the contrary. Reading what **is** contained in the statute, however, does not require us to read into the statute what **is not** there, i.e., that transfers may **only be granted** if requested before a termination of parental rights proceeding is concluded.

¶ 14 When considering the ICWA as a whole, as we must, we first look to the Congressional declaration of policy stated in 25 U.S.C. § 1902,[9] i.e., the protection of the best

---

(iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.

Such term or terms shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents.

7. See note 6.

8. A different division of COCA held transfer is limited to the enumerated proceedings mentioned in § 1911(b), in agreement with the COCA majority in this case. See *In the Matter of J.B.,* 1995 OK CIV APP 91, 900 P.2d 1014.

9. The purpose of the ICWA is stated in the Act itself. See 25 U.S.C. § 1902:

The Congress hereby declares that it is the policy of this Nation to protect the best inter-

interests of Indian children, the stability and security of Indian tribes and families, and the preservation of Indian values and culture **to be reflected in the placement of Indian children in foster and adoptive homes.** [emphasis added] The Supreme Court considered this statement of policy and purpose in *Holyfield* upon determining that Congress did not intend to rely on state law for the definition of "domicile":

> [I]t is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with rights of Indian families and Indian communities vis-a-vis state authorities. [footnote omitted] More specifically, its purpose was, in part, to make clear that in certain situations the state courts did *not* have jurisdiction over child custody proceedings. Indeed, the congressional findings that are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct.

490 U.S. at 44–45, 109 S.Ct. at 1606 [emphasis in original]. In a footnote accompanying the above text, the Court stated:

> This conclusion in inescapable from a reading of the entire statute, the main effect of which is to curtail state authority. **See especially §§ 1901, 1911–1916, 1918.** [emphasis added].

490 U.S. at 45, 109 S.Ct. at 1607. With that purpose in mind, we cannot construe § 1911(b), as a matter of law, as an expression of intent to preclude tribal court juris-

diction when transfer is requested after parental rights are terminated.

¶ 15 Recognizing the importance of Indian children to Indian tribes, the Supreme Court also quoted approvingly from a case of the Utah Supreme Court which had become a well-known case on the ICWA, *In re Adoption of Halloway*, 732 P.2d 962 (1986): [10]

> [I]t is precisely in recognition of this relationship [between Indian tribes and Indian children], however, that the ICWA designates the tribal court as the exclusive forum for the determination of custody and adoption matters for reservation-domiciled Indian children, **and the preferred forum for nondomiciliary Indian Children.** [State] abandonment law cannot be used to frustrate the federal legislative judgment expressed in the ICWA that the **interests of the tribe** in custodial decisions made with respect to Indian children are as entitled to respect as the interests of the parents. [emphasis added.]

*Holyfield*, 490 U.S. 30, 52–53, 109 S.Ct. 1597, 1610, quoting *In re Adoption of Halloway*, 732 P.2d 962, 969–970 (Utah, 1986).

### b. Standard of Review

■ ¶ 16 While *Holyfield* is factually distinguishable in its application to reservation-domiciled Indian children under § 1911(a), it is instructive here because of the Court's emphasis on "concurrent but presumptively tribal jurisdiction" in cases under § 1911(b). *Holyfield*, 490 U.S. 30, 36, 109 S.Ct. 1597, 1601–1602. Because of the importance of Indian children to Indian tribes, as recognized by the Congressional ICWA poli-

ests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

10. The Indian mother, domiciled on a reservation, tried to circumvent the purpose of the ICWA by changing her child's domicile through manipulation of state abandonment law. She arranged for a relative to take her son off the reservation to non-Indian adoptive parents to

facilitate a voluntary adoption in state court. The trial court declared the child was abandoned and moved forward with the adoption. The Utah Supreme Court held in favor of tribal court jurisdiction because state court jurisdiction had been achieved through manipulation. The Court held "this receptivity of the non-Indian forum to non-Indian placement of an Indian child is precisely one of the evils at which the ICWA was aimed." *Halloway*, 732 P.2d at 969, citing the H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 21, reprinted in 1978 U.S.Code Cong. & Ad. News 7530, 7532–33. Thus, although state court jurisdiction could have been found proper, the Supreme Court held it could not prevail in a case under the ICWA and ordered the transfer to tribal court.

cy statement, we will affirm a denial of transfer of jurisdiction to tribal court only upon a showing of "good cause to the contrary."

■ ¶ 17 While this Court has not decided the issue of the standard of proof required to prove "good cause to the contrary" in § 1911(b) cases,[11] and it is not designated in § 1911, we have recognized the right of a parent "to the care, custody, companionship and management of his or her child is a fundamental right protected by the state and federal constitutions." *In the Matter of the Adoption of L.D.S.*, 2006 OK 80, ¶ 11, 155 P.3d 1, 4. In parental termination cases, "clear and convincing evidence" is the standard by which the termination-seeking claimant must prove the potential for harm to the child caused by a parent's abuse or neglect. *In the Matter of C.G.*, 1981 OK 131, ¶ 17, 637 P.2d, 66, 70–71. The nature of the parent-child bond requires proof more substantial than that afforded by the clear weight of the evidence or abuse of discretion standards approved by COCA in this case. It places an appropriately heavy burden upon the State to overcome the law's policy which identifies the child's best interest with that of his or her natural parents. *Id.*

■ ¶ 18 "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." *In the Matter of the Adoption of L.D.S.*, 2006 OK 80, ¶ 11, 155 P.3d 1, 4, quoting *In re*

*C.G.*, 1981 OK 131, ¶ 17, n. 12, 637 P.2d 66, 71 n. 12. This standard of proof "balances the parents' fundamental freedom from family disruption with the state's duty to protect children within its borders." *Matter of Adoption of L.D.S.*, 2006 OK 80, ¶ 11, 155 P.3d at 4, quoting *In re C.G.*, 1981 OK 131, ¶ 17, 637 P.2d at 70.

¶ 19 We acknowledge this case does not require us to decide whether parental rights were terminated by the appropriate "clear and convincing" evidence standard. However, we see a similarity in the potential for harm to the relationship between an Indian child and the child's tribe if the standard of proof required for "good cause" not to transfer is inadequate. It could allow a state court to sever the relationship between child and tribe and to determine the future course of Indian children's lives without consideration of the "unique values of Indian culture" being reflected in their ultimate placement. See § 1902, n. 10, *supra*. The "clear and convincing" standard is the appropriate standard to use here. To the extent *In the Matter of J.B.*, 1995 OK CIV APP 91, 900 P.2d 1014, is inconsistent with our holding, it is expressly overruled.

### c. Good Cause

■ ¶ 20 Unfortunately, "good cause" is not defined by the ICWA. Under the Bureau of Indian Affairs (BIA) Guidelines,[12] 44 Fed. Reg. 67584 (1979), "good cause" is defined by a non-exclusive list.[13] In this case, the trial

---

11. It should be noted, however, that in considering "good cause" for denial of transfer to tribal court, we have held that the "best interests of the child" may be considered. *In the Matter of N.L.*, 1988 OK 39, 754 P.2d 863, 869, citing with approval, *Matter of M.E.M.*, 195 Mont. 329, 635 P.2d 1313, 1317 (1981). The Montana Supreme Court reversed and remanded *M.E.M.*, advising the state trial court to first decide the state court/tribal court jurisdictional issue before the termination of parental rights issue. The Court held the State had to carry its burden of showing "good cause to the contrary" with "clear and convincing evidence that the best interests of the child would be injured by such a transfer." The Court also required consideration of the BIA Guidelines, advising that the best interests of the child could prevent a transfer of jurisdiction upon a "clear and convincing" showing by the State. *M.E.M.*, 195 Mont. 329, 635 P.2d 1313, 1317.

12. The Guidelines are not statutes and are not mandatory. They represent BIA interpretations of ICWA provisions.

13. Under the BIA Guidelines, "good cause" is defined:

   (a) Good cause not to transfer the proceeding exists if the Indian child's tribe does not have a tribal court as defined by the Act to which the case can be transferred.
   (b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:
      (i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.
      (ii) The Indian child is over twelve years of age and objects to the transfer.

court's findings of "good cause not to transfer" to tribal court were: (a) the length of time that the State of Oklahoma has exercised jurisdiction prior to the tribe's motion; (b) the relationships established between the children and their foster parents, their attorney, their CASA representative, DHS social workers, and medical providers; and (c) the most relevant evidence regarding the children is located in the State of Oklahoma.

¶ 21 The length of time in which the State exercised jurisdiction before the Tribe's request for transfer must be addressed because it affects the timeliness issue under § 1911(b), i.e., whether transfer may be approved following the termination proceeding. Resolution of this issue will resolve the other two reasons for denying transfer, i.e., the children's relationships and the availability of the evidence in Oklahoma.

¶ 22 The Tribe was not initially given notice on September 8, 2004, when the State filed its petition resulting in the removal of the children from the home. The State placed the children with the Simmons. The Tribe sought to intervene in this case on December 16, 2004, within three months after the petition was filed. It appears from the record that the State and the Tribe had an agreement that if reunification efforts failed and the State sought the termination of parental rights, the State would place M.S. and K.S. in a Puyallup foster home. When it became obvious that reunification would not occur, the State moved to terminate parental rights on March 28, 2006. Parental rights were terminated on June 21, 2006, by order filed June 23, 2006.

¶ 23 In apparent compliance with its agreement with the Tribe, the State gave notice of removal of placement on June 26, 2006. The Simmons objected to removal on July 5, 2006, and filed a request for hearing through the children's attorney. However, the attorney did not serve a copy on the Tribe. In an affidavit by the Tribe's counsel, Sandra Cooper, dated July 27, 2006, we learn that a copy of the motion was luckily included in a packet of other materials mailed to the Tribe, but with insufficient time to prepare for the hearing. The affidavit also provides that the Tribe's efforts to participate in the hearing by telephone conference were attempted in vain.[14] The objection to removal was granted, and the children remained in foster care with the Simmons.

¶ 24 The Tribe's witness, Tara Reynon, social worker and director of children's services for the Tribe, testified as to the alleged "24 month gap" which had passed since the children were removed from their home. She also spoke about the Tribe's initial support for reunification of M.S. and K.S. with their parents. She stated:

> The first 12 months the Tribe was under the understanding that the children would remain here so that they could try to reunite with their parents. That was the first 12 months. And then since May of 2005 when we knew that they were—when we were getting the information that possibly that they wouldn't be reunited that the children would be moved to Florida with a relative, which was our wishes from the beginning. So 12 months, we look at to where it was hopefully reunification. So truly after it has only been 12 months, we're looking for permanency. And not only that, but termination didn't even occur until this year. So it hasn't even been 12 [months] since the children were free for adoption.
>
> · · ·
>
> We were very hopeful they would get their children back.

(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.

(c) Socio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in a determination that good cause exists.

(d) The burden of establishing good cause to the contrary shall be on the party opposing the transfer.

14. Ms. Cooper's affidavit states that although arrangements were made for a telephone conference, they did not receive a call during the hearing.

¶ 25 Delay also occurred due to the untimely death of the children's great aunt, Gabriella Morely, the sister of Michelle Smith–Valdez, the current custodian. After plans were made for the children to be placed with Gabriella and her husband in Florida, she developed breast cancer and died shortly thereafter. Subsequent to Morely's death, Smith–Valdez expressed an interest in becoming the custodian of the children.[15] Visits were made with the children, and evidence showed that the children seemed happy around her and her grown children.

¶ 26 As noted above, parental rights were terminated on June 21, 2006, in this case. The Tribe offered three letters from Sandra Cooper, ICW Liaison for the Tribe, which were admitted into evidence at the transfer and placement hearing. They were addressed to Naomi Kelly, DHS Child Welfare Specialist. These letters are dated May 5, 2005, July 8, 2005 and November 30, 2005, and show that as much as a year before termination occurred, the Tribe showed an interest in having the children placed with Puyallup tribal family members. The evidence also shows that the family members had an interest in having the children and that the State was aware of their interest at that time.

¶ 27 COCA interpreted the Tribe's actions as inadequate to overcome the requisite "good cause to the contrary" to justify denial of transfer under § 1911(b). The timeliness issue was decided against the Tribe because transfer was not requested at the time of the "foster care placement" or "termination of parental rights" proceedings as a matter of law under § 1911(b). The appellate court appears to have satisfied itself that good cause to deny transfer existed on the basis of a lack of diligence.

¶ 28 However, we see the Tribe's actions in a different light. We see delays caused through circumstances outside the Tribe's control. Supporting the State's reunification efforts should not result in allegations of a Tribe's lack of diligence in requesting transfer. Evidence shows the Tribe's interest in these children through the letters admitted into evidence, the agreement with the State for placement with a tribal member or family member if termination was sought, and the availability of not one, but two, great aunts wishing to take the children permanently. The record shows the Tribe was effectively prevented from attending a hearing which resulted in placement with the Simmons. The Tribe believed their agreement with the State for placement with tribal members or relatives would be honored, and because of this, waited to request transfer. It appears the Tribe was unfairly penalized for entering into that agreement. Moreover, the unfortunate circumstances of the death of the Children's great aunt, Gabriella Morely, led to further delays.

¶ 29 In *In the Interest of A.B.*, 2003 ND 98, 663 N.W.2d 625, a case this Court cited approvingly in *The Matter of Baby Boy L.*, 2004 OK 93, 103 P.3d 1099,[16] the North Dakota Supreme Court upheld a juvenile court's decision overruling an order denying transfer to tribal court. The case was first heard by a judicial Referee. The Referee found the termination case was at an advanced stage of the child custody proceedings and was therefore untimely. The Referee also ruled the tribal court was an inconvenient forum. The juvenile court reversed.

¶ 30 The N.D. Supreme Court considered the BIA Guidelines' discussion of "good cause" to deny transfer and stated:

> As relevant to this case, the BIA Guidelines state that good cause to deny transfer of a child custody proceeding to tribal court exists if the proceeding is at an advanced stage when the petition to transfer is received, or if the evidence to decide the case could not be adequately presented in the tribal court without undue hardship

---

15. Ms. Reynon also testified what the Tribe's understanding was if the parental rights were terminated:

> It's been the Tribe's understanding that the great aunt—first, Gabriel was going to be the placement resource. When she passed away, it was going to be Ms. Valdez.

16. In *Baby Boy L.*, this Court declared the doctrine of the "existing Indian family exception" to the application of the ICWA was no longer viable. We recognized *A.B.* as a case which was in accord with our holding.

to the parties or the witnesses. BIA Guidelines, § C.3(b)(i) and (iii) at 67591. *In re A.B.*, 2003 ND 98, ¶ 16, 663 N.W.2d at 631.

¶ 31 The Referee determined the length of time elapsed before requesting transfer ran from March 2001 until July 2002. In reaching that determination, the Referee found the foster care proceeding was part of the termination proceeding, and that the motion to transfer was thus filed at an advanced stage of the overall child custody proceeding and, therefore, untimely. The juvenile court disagreed, ruling the two phases were separate proceedings. Moreover, the court found the tribe had filed its motion to transfer within approximately seven weeks after the petition to terminate parental rights was filed, and about two weeks before the scheduled trial, and that the termination proceeding was therefore not at an advanced stage when the transfer was requested. The Supreme Court agreed and upheld the juvenile court's order overruling the Referee.

■ ¶ 32 Whether a motion to transfer jurisdiction is timely is determined on a case-by-case basis. *In re A.B.*, 2003 ND 98, ¶ 21, 663 N.W.2d 625, 632–633. Relying on the BIA Guidelines, the Court noted:

> [T]he commentary to the BIA Guidelines indicates the requirement for a timely motion to transfer precludes a party from using delay tactics to "wear down the other side by requiring the case to be tried twice." *Id.* At a minimum, the BIA Guidelines contemplate that a motion to transfer is not timely if transfer would require a retrial.

*In re A.B.*, 2003 ND 98, ¶ 20, 663 N.W.2d 625, 632; *cf., In the Interest of D.M., R.M. III, and T.B.C.*, 2004 SD 90, 685 N.W.2d 768, wherein the South Dakota Supreme Court upheld a finding a transfer request was not timely, despite the tribe's allegation it did not receive proper notice. The Court held the tribe had actual notice of the child custody proceeding "and that it **was not prevented by the actions of the State from requesting**

transfer." 2004 SD 90, ¶ 16, 685 N.W.2d 768, 772 [emphasis added]. The Court held instead that the delay was due to the Tribe's apparent inability to find placement until it became aware the State intended to seek termination. *Id.*

¶ 33 In the instant case, it cannot be said that the Tribe's delay in requesting transfer "was not prevented by the actions of the State...." In fact, the evidence supports a finding that the Tribe's actions were consistent with its belief that, when reunification failed, the State would proceed to satisfy its agreement with the Tribe. The record shows the motion to terminate parental rights was filed on March 28, 2006, but the order of termination was not filed until June 23, 2006. Next, the State's notice to remove the children from the foster home was filed on June 27, 2006. The Simmons' objection was then filed on July 5, 2006, but the Tribe only inadvertently received a copy of it and was, in effect, prevented from participating in a meaningful way. On July 27, 2006, the trial court sustained the Simmons' objection to removal of the children. Then, on August 4, 2006, the Tribe filed its motion to transfer, followed by its petition to transfer on September 21, 2006. In summary, the Tribe had no reason to file a motion to transfer until sometime between July 5, 2006, when the Simmons objected to removal, and July 27, 2006, when the trial court sustained their objection. In other words, the longest the Tribe waited from the time of the objection until the petition to transfer was filed was seven weeks.[17] We note that in *A.B., supra,* the Referee would have denied transfer under § 1911(b) even **during** the proceeding to terminate parental rights, which is apparently allowed by the statute. Thus, the "case-to-case" basis for finding "good cause" is the approach we must follow, and of which we approve, when considering the long-term consequences of the jurisdiction of the tribal court in cases under the ICWA.

¶ 34 We also find this result to be consistent with Oklahoma's Indian Child Welfare Act. Oklahoma's ICWA applies to *all* child

---

**17.** From the time of the Simmons' objection (July 5, 2006) until the Tribe's "motion to trans-

fer" on August 4, 2006, is only four weeks.

custody proceedings and thus provides better protection to the Tribe.[18]  See 25 U.S.C. § 1921:

> In any case where State or Federal law applicable to a child custody proceeding under State or Federal law provides a **higher standard of protection** to the rights of the parent or Indian custodian of an Indian child than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard. [emphasis added.]

¶ 35  In *Cherokee Nation v. Nomura,* 2007 OK 40, ¶ 26, 160 P.3d 967, 976–977, we held, citing *Holyfield,* that the "higher standard of protection" under § 1921 extends to the Tribe as well as to the parent or Indian custodian of an Indian child.  The Oklahoma Act's purpose is to support the federal act.  See 10 O.S.2001 § 40.1.[19]

¶ 36  The finding of "good cause" not to transfer was against the clear and convincing evidence in this case.  The factual circumstances in this case should have worked in favor of the Tribe, not against it.  COCA's holding that transfer was not allowed under § 1911(b), as a matter of law, violated the purpose and intent of the ICWA to preserve the bond between Indian tribe and child.  Construing the statute in the manner it did, COCA effectively made the Tribe's protections under the ICWA unavailable to it.  The order denying the Tribe's motion to transfer jurisdiction to the tribal court and COCA's ruling affirming it are reversed.

18. Oklahoma's counter-part to this section of the ICWA, 10 O.S.2001 § 40.3, provides in part:
    B.  Except as provided for in subsection A of this section, the Oklahoma Indian Child Welfare Act applies to all state voluntary and involuntary child custody court proceedings involving Indian children, regardless of whether or not the children involved are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated.

19.  **40.1. Purpose–Policy of state**
    The purpose of the Oklahoma Indian Child Welfare Act is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the federal Indian Child Welfare Act, P.L. 95–608.  It shall be the policy of the state to recognize that Indian

## PLACEMENT

¶ 37  We previously noted that during the pendency of this appeal, the trial court executed an "Order Changing Placement" on December 18, 2008, providing for placement with Michelle Smith–Valdez, the great aunt of M.S. and K.S.  The trial court received evidence and then filed its Order Changing Placement on December 19, 2008.  The court ruled there was no longer good cause to deviate from the ICWA placement preferences and placed the children with Smith–Valdez.  The order incorporates and adopts the Florida Placement Transition Plan (Plan) attached thereto for M.S. and K.S., and the time frame for the Plan is December, 2008, through June 2009.  The Plan is ongoing, however, until the court sets the next review.

¶ 38  On April 15, 2009, 13 days before COCA issued its first opinion on April 28, 2009, the Tribe requested a stay of the proceedings, alleging that a hearing scheduled for June of that year may moot the appeal.  It explained that the trial court had conducted a placement review hearing regarding the temporary placement of M.S. and K.S. on December 15 and 16, 2008, and that another one was set for June 9, 2009.

¶ 39  The Tribe filed its petition for rehearing on May 18, 2009, raising, *inter alia,* the mootness issue because of the new placement order.  COCA issued its Order Granting Rehearing and Denying Motion to Stay on July 15, 2009, the same day it issued its new opinion on rehearing.

tribes and nations have a valid governmental interest in Indian children regardless of whether or not said children are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated.  It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced.

Moreover, we noted in *The Matter of Baby Boy L.,* 2004 OK 93, 103 P.3d 1099, our Legislature's obvious awareness of *Holyfield* in its attempt to conform our laws with the federal ICWA by eliminating the "existing Indian family exception" from our jurisprudence.  See note 16, supra.

¶ 40 While the propriety of the placement order initially entered was properly preserved for appeal, on certiorari the Tribe contended the new order required us to declare the entire COCA opinion, as amended on rehearing, moot. This we decline to do. However, we also find it unnecessary to consider the errors raised by the Tribe on appeal regarding the first placement order [20] because a new order is now in effect.

¶ 41 Although COCA noted in its Order Granting Rehearing and Denying Motion to Stay, that the new order is "provisional and not final" and "does not affect or rescind previous rulings made in this case, but shall apply in the present and prospectively," we hold the new order renders the first order ineffective.[21]

¶ 42 The opinion of the Court of Civil Appeals is vacated. The order of the trial court denying the Tribe's motion to transfer this case to tribal court is reversed. The order of the trial court denying the Tribe's alternative motion for placement is no longer in effect, having been replaced by a subsequent order. This case is remanded to the trial court for further proceedings in accordance with the views expressed in this opinion.

**THE OPINION OF THE COURT OF CIVIL APPEALS IS VACATED; TRIAL COURT'S ORDER DENYING MOTION TO TRANSFER JURISDICTION IS REVERSED; REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THE VIEWS EXPRESSED IN THIS OPINION.**

EDMONDSON, C.J., OPALA, KAUGER, WATT, COLBERT, JJ., concur.

HARGRAVE, WINCHESTER, JJ., concur in part; dissent in part.

TAYLOR, V.C.J., dissent.

REIF, J., disqualified.

WINCHESTER, J., concurring in part and dissenting in part:

¶ 1 I concur with the majority opinion's finding that § 1911(b) does not preclude tribal court jurisdiction when transfer is sought after parental rights are terminated. I dissent to that part of the opinion which finds that COCA erred "by failing to use the 'clear and convincing' evidence standard in its review of the trial court's finding of 'good cause' to deny the Tribe's request."

¶ 2 I believe that the determination of whether good cause exists to retain jurisdiction is within the trial court's discretion and is best determined on a case-by-case basis after consideration of all the relevant circumstances involved. It is my opinion that the trial judge considered all relevant factors and properly declined to transfer the case to the Puyallup Tribal Court in Washington State. The majority opinion's use of the higher, clear and convincing standard of proof, which

---

20. A reason given by the trial court for denying the Tribe's motion for placement is its finding that the children would be *eligible* for membership in the Cherokee tribe. The Court held:
 The Children are members of the Puyallup Tribe. But for their membership in the Puyallup Tribe, the children would be eligible for membership in the Cherokee Tribe. The sibling who continues to reside with the children in the foster home is a member of the Cherokee Tribe. The foster home has been approved by the Cherokee Tribe. The Puyallup Tribe had never informed the Court of any objection to the foster home until filing its Petition to Transfer and Motion for Placement.
 The court implies that the children's connection to the Cherokee Tribe is a valid reason to deny the Puyallup Tribe's motion for placement. However, the focus of this case has never been whether the **Cherokee Tribe's** connection to M.S. and K.S. could suffice to provide them with an understanding of the Puyallup Tribe's tradition, culture and history as members of that tribe. COCA held it is the Cherokee heritage of M.S. and K.S. which they share with their siblings which the Tribe chooses to ignore. However, evidence was admitted that the Cherokee Nation will not allow its members to be a member of another tribe. M.S. and K.S. are therefore not eligible for membership with the Cherokee Nation, and the foster home could not be considered their tribal home.

21. This Court is not considering the issue of whether error was committed regarding the proper standard of review for "good cause" to deviate from the placement preferences of 25 U.S.C. § 1915. However, our decision today calls into question the case *In the Matter of B.B.A.*, 2009 OK CIV APP 80, 224 P.3d 1285, which holds the "abuse of discretion" standard is applicable. We leave that issue for another day.

is required in parental termination cases, is inappropriate in this purely jurisdictional matter.

¶ 3 I agree with the majority that the Tribe's delay in seeking the motion to transfer was likely justified. However, I believe that the inconvenience of the Tribe's Washington State location coupled with the fact that the vast majority of witnesses and all relevant evidence reside in Oklahoma justify the trial court's determination of good cause to retain the case. Accordingly, I would affirm the ruling of the trial court denying the Tribe's request to transfer jurisdiction.